**Stephen BYRD, Appellant–Defendant,**

**v.**

**STATE of Indiana, Appellee–Plaintiff.**

**No. 48A04–9012–CR–576.[1]**

Court of Appeals of Indiana,
First District.

Oct. 7, 1991.

Rehearing Denied Nov. 19, 1991.

---

1. This case was diverted to this office by direction of the Chief Judge.

Jeffrey A. Lockwood, Mitchell P. Chabraja, Schuyler, Eisele & Lockwood, Anderson, for appellant-defendant.

Linley E. Pearson, Atty. Gen., Louis E. Ransdell, Deputy Atty. Gen., Indianapolis, for appellee-plaintiff.

BAKER, Judge.

Defendant-appellant Stephen Byrd appeals his conviction for the murder[2] of Linda Chafin. His five issues for our review are:

1. Whether the trial court erred in limiting the testimony of the defense psychiatrist.

2. Whether the trial court erred in giving final instruction no. 32.

3. Whether the trial court erred in allowing testimony of the victim's state of mind.

4. Whether the trial court erred in allowing testimony regarding Byrd's extrinsic offenses.

5. Whether there was sufficient evidence to sustain Byrd's conviction.

We reverse and remand for a new trial. Because we anticipate the same or similar issues arising on remand, we address them now.

## FACTS

The defendant, Stephen Byrd, spent much of the evening of August 13, 1988, drinking beer with four friends in Summitville, Indiana. Later, while driving around and smoking marijuana, Byrd noticed the car of his girlfriend, Linda Chafin, at the home of Vicki Hobbs. At about 1:30 a.m. the next morning, after saying good-bye to his friends, Byrd went to Hobbs's home. Already there were Hobbs, Chafin, and Gary Rankin, the assistant chief of the local fire department. These three were chatting in the backyard. Also present when Byrd arrived were Linda Chafin's two sons, Jason and Ryan. Ryan was in the house, and Jason was outside in the front yard.

As Byrd left his vehicle, he asked Jason where Linda was. When told she was in the backyard, Byrd became angry and ran toward the rear. Meanwhile, the three in the backyard had heard Byrd arrive. Linda Chafin went to greet him. Byrd and Chafin met in a lighted area at the side of the house. A few moments later, Gary Rankin heard them struggling. Rankin went to investigate, with Vicki Hobbs close behind. As Rankin approached Byrd and Chafin, he saw that Byrd was holding Chafin's waist. When Rankin identified himself to Byrd, Byrd struck him twice in the face. Rankin fled. Vicki Hobbs then approached Byrd, and she was struck twice and rendered unconscious. During both attacks, Byrd did not let go of Chafin.

Although Jason Chafin saw Byrd shaking his mother Linda and moving her to an unlit part of the yard, no one actually saw Byrd strike Linda Chafin. Some minutes later, after regaining consciousness, Vicki Hobbs discovered Chafin's body in a nearby unlit area among some trees. Byrd was gone.

Chafin's autopsy revealed that she died as a result of blunt force trauma to the head. A contributing factor was asphyxiation caused by significant quantities of dirt clogging Chafin's airway. The actual cause of death was massive bleeding on and in the brain created by the blunt trauma to the right side of Chafin's face and neck.

A few hours after the discovery of Chafin's death, Byrd surrendered to the local town marshal. At his trial, Byrd repeatedly maintained that he could not remember

---

2. IND.CODE 35-42-1-1

what happened. The state insisted Byrd killed Chafin by striking her and pushing her face into the dirt. The jury convicted Byrd of the murder of Linda Chafin and the battery of Vicki Hobbs. He was sentenced to 40 years' imprisonment for murder and eight years for battery, to be served concurrently.

## DISCUSSION AND DECISION

### 1. Psychiatric Testimony

Byrd's first issue on appeal concerns the trial court's refusal to allow Byrd's psychiatrist, Dr. Larry Davis, to testify about A) Byrd's psychological profile and B) Byrd's professed memory loss. We shall address both contentions in turn.

### A. Minnesota Multi–Phasic Personality Inventory

Byrd claims it was error for the trial court to refuse to allow Dr. Davis to testify that his examination of Byrd and Byrd's Minnesota Multi–Phasic Personality Inventory ("MMPI") suggested Byrd's psychological profile was inconsistent with the "knowingly killed" element of the murder charge. Dr. Davis testified the MMPI is generally accepted in the disciplines of psychiatry and psychology as a method of evaluating an individual's personality profile. The test is used by practitioners not as a primary source of information but instead as a means of confirming or challenging clinical impressions previously gained through direct contact with the pa-

tient. For reasons not revealed in the record, the trial court ruled that Dr. Davis would not be allowed to testify before the jury that in his opinion, Byrd's psychological profile as indicated by his assessment and the MMPI results was inconsistent with the knowing element charged in the murder information against Byrd.[3]

■ We use an abuse of discretion standard when reviewing questions of admissibility of evidence: the trial court's judgment on an item of evidence's admissibility will be upheld unless clearly erroneous. *State v. Snyder* (1991), Ind.App., 570 N.E.2d 947. Nonetheless, the right to present exculpatory evidence in one's own defense is fundamental. *Washington v. Texas* (1967), 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019.

■ In this case we confront the testimony of an expert witness. "An expert is one who by reason of education or special experience has knowledge respecting a subject matter about which persons having no particular training are incapable of forming an accurate opinion or making a correct deduction." *Wade v. State* (1986), Ind., 490 N.E.2d 1097, 1104. To be admissible, the expert witness's testimony must be such that it will appear to aid the trier of fact in understanding the facts. *Wissman v. State* (1989), Ind., 540 N.E.2d 1209, 1213; *Rubin v. Johnson* (1990), Ind.App., 550 N.E.2d 324, 328. No precise quantum of knowledge is necessary if the witness can demonstrate a sufficient knowledge of the subject. *Wissman, supra,* at 1212–13.

3. With regard to the offer of proof made, the record reads as follows:
Q.: Doctor do you have an opinion within a reasonable degree of medical certainty whether or not the allegations contained in Count I of the information charging Murder are inconsistent with the defendant's personality profile?
A.: Yes I have an opinion.
Q.: What is that opinion?
A.: It is my opinion that the assessment that I have conducted finds the personality structured profile of the defendant to be inconsistent with the charges as I understand them that you have just described.
    *    *    *    *    *    *
Q.: Doctor upon what did you base your opinion that the profile of Steve Byrd is inconsistent with that charge?

A.: My principal source of opinion is my assessment of the individual and his characteristics from direct interview. Secondarily I have reviewed to the extent of the knowledge available to me both from the defendant and I have asked you if there are patterns of violent behavior and I am not aware of a pattern of such behavior which is invariably present in a man of this age if such pattern exists. And the MMPI, this description of the passivity, aggressiveness, assertiveness, social skills of the defendant.
Q.: Thank you doctor. Your Honor at this time the defendant would offer into evidence for purpose of this offer to prove Defendant's Exhibit V [the MMPI]. *Record* 1176–1178.

■ Here, there is no dispute that Dr. Davis is an adequately qualified psychiatrist. There is no dispute that he is fully capable of interpreting the results of his own examinations of Byrd and of the MMPI.[4] There is no dispute Dr. Davis's clinical examinations and psychiatric evaluations are beyond the common knowledge of the ordinary person. *See State v. Romero* (1990), 563 N.E.2d 134, 138 (expert psychological testimony concerning reconstructive memory beyond knowledge of average person). There is no dispute the MMPI is generally accepted in the discipline as a legitimate and helpful aid in assessing psychological profiles. Finally, there is no dispute Dr. Davis's testimony would have assisted the trier of fact in addressing the issue of culpability.[5]

We agree with Byrd's assertion that Dr. Davis's testimony regarding the MMPI test was relevant. Contrary to the state's assertion, the record makes clear Dr. Davis's testimony about the MMPI was not offered to show whether Byrd in fact possessed the requisite *mens rea.* Rather, Byrd offered Dr. Davis's testimony only to show that Byrd's psychological profile and the MMPI test results were inconsistent with the knowing element of the crime of murder, *Record* at 1156, 1176–77; the results were not offered to show that Dr. Davis himself opined that Byrd did not knowingly kill Chafin. The MMPI results were admitted into evidence, so Dr. Davis's proffered testimony was based on facts in evidence; therefore, Dr. Davis's testimony met the proper foundational requirements for admissibility. *Henson v. State* (1989), Ind., 535 N.E.2d 1189; *Ulrich v. State* (1990), Ind.App., 550 N.E.2d 114, 115, *trans. denied* (MMPI used to show appellant's personality profile was inconsistent with allegations against him properly excluded be-

cause questions and answers from MMPI not placed into evidence).

The issue of culpability in this case was very much at issue. Dr. Davis was shown to be an expert witness, and the subject matter of his testimony, which was well beyond the scope of the average juror's knowledge, was in evidence before the court. Dr. Davis's testimony was not offered to give a direct opinion of Byrd's credibility or of whether or not Byrd knowingly killed Linda Chafin; his function was to testify that in his opinion, the results of Byrd's psychological profile were inconsistent with the knowingly killed element of the crime of murder. The evidence was relevant, and we hold the trial court erred in ruling it inadmissible.

**B. Memory Loss**

During the trial, Byrd repeatedly maintained he could not remember what, if anything, happened between him and Chafin during their brief encounter described above. Dr. Davis was prepared to testify before the jury that this proclaimed memory loss could legitimately be retrograde or traumatic amnesia and, if so, what could cause it. The trial court refused to admit the testimony of Dr. Davis.

Byrd argues Dr. Davis's proffered testimony that Byrd's memory loss is consistent with clinically observed "retrograde amnesia" tends to support Byrd's claim he really did lose his memory. The state insists this testimony is tantamount to having Dr. Davis tell the jury that Byrd was telling the truth when he said he could not remember.

We note initially that memory loss is normally not an issue directly germane to a criminal defense. Standing alone, it certainly is not a defense to the charge of murder. Byrd did not raise memory loss

---

**4.** Dr. Davis did not administer the MMPI to Byrd personally. That was done by an in-house psychologist. Dr. Davis testified, however, that he had reviewed "a couple of thousand" MMPIs, and had "developed a reasonable correlation" of the test results and his own independent examination of his patients, of whom Byrd was one. *Record* at 1175.

**5.** At oral argument held September 18, 1991, at Franklin High School, Franklin, Indiana, the state suggested psychiatric testimony is subject to a higher standard of scrutiny than other scientific evidence because of its inherently conjectural nature. We reject this argument without hesitation. The state's concern goes to the weight to be given psychiatric testimony, not to its admissibility.

as a defense at his trial, but did use it to explain why he simply could not remember what, if anything, happened on the night in question. The State missed few opportunities to express its disbelief of Byrd's memory loss. During cross examination and closing argument, the State repeatedly attacked Byrd's credibility by questioning the validity of his claimed memory loss. Thus, the question of memory loss was at issue to the extent it implicated Byrd's credibility.

■ It is improper for an expert witness to express a direct opinion as to the credibility of other witnesses. *Head v. State* (1988), Ind., 519 N.E.2d 151. While the proffered testimony of Dr. Davis tends to show Byrd's memory loss testimony was credible, we hold it does not amount to direct testimony as to his credibility.

> All testimony which contradicts one party's version of a set of events raises questions about that party's credibility; however, that does not make the testimony inadmissible. If that were the case, a defendant would be hard pressed to ever present any sort of defense in his own behalf since the core of any defense usually involves a denial that the alleged criminal conduct occurred.

*Henson, supra,* at 1193.

■ In *Henson*, a young woman was allegedly raped by a fellow patron at a local bar. She did not report it. The next night, the woman returned to the bar and was seen having drinks and dancing. Eventually the woman reported the rape that had occurred the first night. At trial, the defense psychologist was prohibited from testifying before the jury that the woman's behavior on the second evening was inconsistent with that of a victim who had suffered a traumatic rape such as that the woman recounted. The state argued, as it does in this case, that such testimony would amount to an opinion on the woman's credibility. The supreme court ruled that although the psychologist's testimony would tend to show the woman's testimony

was not credible, it was not direct testimony as to her credibility. *Id.* at 1192–93. We view the situation in *Henson* as indistinguishable from the one before us currently. It was error for the trial court to exclude the proffered testimony, given that it did not amount to a direct comment on Byrd's credibility, and given that the state characterized Byrd's memory loss testimony as unreasonable on several occasions, thus placing his credibility in issue. Byrd should have been afforded an opportunity to respond to the state's attack on his credibility.

Although we find the erroneous exclusion of Dr. Davis's testimony dispositive to this appeal, we discuss the remaining issues presented to us in order to address issues which may similarly arise on retrial.

2. Instruction Number 32

The court gave the following instruction: Voluntary intoxication including use of marijuana is not a defense to the commission of the crimes charged in this case. Lack of memory by the Defendant is not a defense to the crimes charged in this case.

Byrd objected to the giving of this instruction at trial, claiming it would confuse and mislead the jury because Byrd had not raised either intoxication or memory loss as a defense.[6]

■ Upon review of a jury instruction given and objected to, we consider first whether the tendered instruction is a correct statement of the law, whether there is evidence to support the giving of the instruction, and whether the substance of the tendered instruction is covered by other instructions given. *Smith v. State* (1984), Ind., 468 N.E.2d 512. Reversal is not warranted in the giving of a particular instruction unless it is of such a nature that the entire charge of which it is a part misleads the jury. *Melendez v. State* (1987), Ind., 511 N.E.2d 454, 457.

■ In applying our standard of review to the facts, although the voluntary intoxi-

---

**6.** At oral argument, Byrd abandoned his claim that the portion of the instruction regarding memory loss was erroneously given. Accord-

ingly, we will not discuss the issue other than to agree with Byrd that it was properly given.

cation portion of the instruction was a correct statement of the law in this case, since Byrd did not raise it as a defense, we find there was a lack of evidence on voluntary intoxication adduced at trial sufficient to warrant this portion of the instruction. *Gibson v. State* (1987), Ind., 516 N.E.2d 31. Because there were no other instructions given on the issue of intoxication, we are unable to conclude the complete set of instructions, when considered as a whole, rectifies any error in one particular instruction. *Melendez, supra.* The giving of this portion of the instruction was error, but would not warrant reversal because Byrd has failed to show resultant prejudice.[7]

### 3. *Victim's State of Mind*

Linda Chafin's mother, Patricia Cramer, was permitted to testify to several instances involving Byrd and Chafin that suggest elements of conflict between the two. Ms. Cramer testified that once, while speaking on the phone to Chafin, she heard Chafin cry out, "Oh God, [Byrd] is back." She immediately drove to Chafin's house, and found Chafin huddled in a kitchen corner, clutching a knife and shaking violently. She also testified that on many instances Chafin pulled her car far in the driveway to hide her presence from Byrd, and that she brushed her tire tracks out of the snow. Byrd argues Ms. Cramer's testimony concerning the victim's state of mind is improper and amounts to inadmissible, irrelevant hearsay.

"Hearsay is in court evidence of a statement which was made out-of-court, such evidence having been offered to show the truth of the matter asserted." *Stahl v. State* (1986), Ind.App., 497 N.E.2d 927, 929 (citation omitted). A "statement" may be non-verbal, so long as it is meant as the equivalent of a verbal assertion. *See generally Luginbahl v. State* (1987), Ind.App., 507 N.E.2d 620, 623–24, n. 2; *Watt v. State* (1980), Ind.App., 412 N.E.2d 90, 96; McCormick, McCORMICK ON EVIDENCE § 250 (3d. ed. 1984). Any statement not offered for purposes of proving the facts asserted therein simply is not hearsay, and therefore cannot be subject to any hearsay exception. *Ballard's Estate v. Ballard* (1982), Ind.App., 434 N.E.2d 136. An in-court statement made by an out-of-court declarant offered to prove the truth of the matter asserted is hearsay, but may nonetheless be admissible under one or more of the many hearsay exceptions.

In a case with facts remarkably similar to those facing us, *Lock v. State* (1991), Ind., 567 N.E.2d 1155, our supreme court confronted victim state of mind testimony in the form of hearsay. In the case before us, we have one instance of verbal expression ("Oh God, [Byrd] is back,") and two instances of conduct (huddling in corner and brushing tire tracks from snow). Byrd insists each of these is hearsay. We disagree. "Oh God, [Byrd] is back," is not hearsay because it was not offered to prove Byrd had, in fact, returned.[8] Whether Byrd had returned or not is not relevant. Instead, it illustrated Chafin's fear of Byrd. Chafin huddling in the kitchen corner and brushing her tire tracks amounts to nonassertive conduct, and is therefore not hearsay. To be sure, this evidence illustrates a certain amount of conflict between Byrd and Chafin. But it is not hearsay. Even if it were hearsay, under the authority of *Lock, infra,* Ms. Cramer's testimony would still be admissible.

Byrd next argues victim state of mind testimony is irrelevant and inadmissi-

---

7. Should the evidence warrant such an instruction on remand, the preferred instruction on voluntary intoxication may be found in Indiana Judges Association, INDIANA PATTERN JURY INSTRUCTIONS (CRIMINAL) No. 10.09 (2d. ed. 1991) at page 463. It reads as follows:

Voluntary intoxication is a defense to the crime of [murder].

In order for intoxication to relieve the defendant from responsibility for the crime charged, the defendant must have been so intoxicated as to be incapable of having the intent to commit the offense charged.

The State has the burden of disproving the defense beyond a reasonable doubt.

8. If it were offered to prove the truth of the matter asserted, the statement would still be admissible under the excited utterance exception to the hearsay rule. *Corder v. State* (1984), Ind., 467 N.E.2d 409.

ble. Again, we disagree. Statements offered to prove the victim's state of mind prior to the crime are admissible. *Lock v. State* (1991), Ind., 567 N.E.2d 1155, 1159; *Drummond v. State* (1984), Ind., 467 N.E.2d 742, 747; *Dunaway v. State* (1982), Ind., 440 N.E.2d 682, 686. In *Lock*, the defendant, Kimberly Lock, was accused of conspiring to murder her mother. The hit man Lock hired to do the job testified Lock gave him the key to enter the victim's home. Lock denied this. The state called the victim's brother and sister who related, over objection, telephone conversations each had had with the victim. The substance of these conversations was that the victim was upset that Lock had not returned the key she borrowed from the victim. On appeal, Lock argued this testimony was hearsay; the state argued it was offered to show the victim's state of mind prior to the crime as being one of fear of Lock.

Our supreme court ruled, in essence, that both positions were correct. The telephone conversation testimony did tend to prove Lock had a key to her mother's house, but it also tended to prove the mother was afraid of Lock. The court then weighed the prejudicial effect of the admission of the statements for the former purpose, i.e. to show Lock had a key, against the value of the admission of the statements to the jury in proving the latter purpose, i.e. the victim was fearful of Lock. The court concluded "the latter purpose prevails because the out-of-court declarations here were offered to prove that [the victim] was apprehensive and fearful and, generally, 'having trouble' with Lock. This, of course, was one of the contested issues at trial." *Id.* at 1159–60.

■ As in *Lock*, the nature of the Byrd–Chafin relationship was a contested issue,[9] and unquestionably the evidence was offered to show Chafin feared Byrd. Unlike *Lock*, however, there is no dual purpose at issue. We need not perform a balancing test as did the court in *Lock*. There was no error in admitting Ms. Cramer's testimony concerning Chafin's state of mind.

### 4. Extrinsic Offenses [10]

■ At trial, the state called Chafin's mother, Pat Cramer. The state asked Ms. Cramer if she recalled a conversation at her house during which Byrd explained a method of killing taught to him while he was a soldier in Viet Nam. Byrd objected on several grounds, which were all overruled. Ms. Cramer answered:

> He said to me, I am not clear on the exact line that the words took, but I remember the words, but it seems to me like … I will just [tell] you what I think he said. He said, "I pushed dirt in the face of lots of gooks," or "I pushed lots of gooks' faces into the dirt." That is what he said.

*Record* at 678. Byrd argues the admission of this testimony is error because it forced him to respond to unexpected accusations of collateral and confusing issues.

Byrd is correct in maintaining evidence of uncharged crimes or misconduct is generally inadmissible if "its sole relevance is to show that the defendant's general character is bad and that he therefore has a

---

9. Byrd contends that the relationship was cordial on the day before Chafin's death: Byrd and Chafin spent the night together, they delivered newspapers together, she fixed him breakfast, and he fixed her car engine. He introduced several letters Chafin wrote during the week preceding her death to further substantiate his claim. While, to be sure, there are genial comments, there are also sentences in these letters like "Haven't heard from Steve. Maybe he is finally through with me. He always leaves his women after awhile," "He's been such an asshole," "It seems useless, we will never get along," "I wish he would stop being so critical," (Defendant's Exhibit Q); "Steve and me are

speaking only," "I keep hoping next time he'll stay nice. But I'm a fool and I know it," (Defendant's Exhibit S); "I just got the route done and had my morning bitch call from Steve. We're fussing again after one day of getting along," "So we were bitching and fighting again. Not bad, just normal," (Defendant's Exhibit S). *Record* at 697–699.

10. In *Gibbs v. State* (1989), Ind., 538 N.E.2d 937, 939 n. 1, the supreme court adopted the term "extrinsic offenses" for uncharged crimes or misconduct over formulations such as "unrelated criminal activity," "prior bad acts," and "similar crime."

tendency to commit crimes." *Street v. State* (1991), Ind.App., 567 N.E.2d 1180, 1183 (citing *Penley v. State* (1987), Ind., 506 N.E.2d 806, 808) (citations omitted). We disagree, however, with Byrd's underlying premise that killing enemy soldiers [11] in a certain way during hostilities constitutes a "bad act" for the purposes of the general rule enunciated. At common law, an intentional killing "commanded or authorized" by law was justifiable, and thus not criminal. R. Perkins & R. Boyce, CRIMINAL LAW 1124 (3rd ed. 1982). An example of a justifiable homicide is "the killing of an enemy on the field of battle as an act of war within the rules of war." [12] Perkins, *A Re-examination of Malicious Afterthought*, 43 Yale L.J. 537, 539 (1934) (citation omitted).[13] Ms. Cramer's testimony did not concern an extrinsic offense.

But even if Ms. Cramer's testimony did concern an extrinsic offense, her testimony was still admissible. "Evidence of other unrelated criminal activity may be admissible to prove an accused's identification, knowledge, intent or motive, or to demonstrate a common plan or scheme of criminal activity from which the accused originated the charged crime." *Sharp v. State* (1989), Ind., 534 N.E.2d 708, 711. Here, no one saw what happened to Linda Chafin. No one knows who, if anyone, did what, if anything, to her. There was, however, evidence that Chafin's face was ground into the dirt in exactly the same manner as Byrd professed to use when fighting "gooks." Under the rule discussed in *Sharp*, Ms. Cramer's testimony was thus relevant to the issue of identification of the person responsible for Chafin's condition,

and, as such, was admissible. The trial court was well within its discretion in admitting the testimony.

### 5. Sufficiency

▅▅▅ Byrd claims the evidence adduced at trial was insufficient to sustain his conviction of murder. We disagree. We must address the issue because were we to find the evidence insufficient to uphold Byrd's murder conviction, we would reverse and acquit.

When reviewing sufficiency claims, this court will consider only that evidence favorable to the verdict, together with all reasonable and logical inferences to be drawn therefrom. *Henriott v. State* (1990), Ind.App., 562 N.E.2d 1325, 1326. We neither reweigh the evidence nor reassess the credibility of the witnesses. *Id.* If there is substantial evidence of probative value, the verdict will not be disturbed on sufficiency grounds. *Id.* When the evidence presented is circumstantial, as it is here, it is not necessary that every reasonable hypothesis of innocence be overcome. *Lovell v. State* (1985), Ind., 474 N.E.2d 505, 507; *Luginbuhl v. State supra.* Instead, it is only necessary that an inference reasonably tending to support a finding of guilt can be drawn from the evidence presented. *McCraney v. State* (1983), Ind., 447 N.E.2d 589, 590; *Luginbuhl, supra*, at 623.

Here, Byrd was seen grabbing Chafin even while badly beating two other people. He was angry and his tone was accusatory. He was seen moving Chafin's still-struggling body to a darkened area, where she was later found. Byrd left immediately. Chafin was found to be relatively clean on

---

11. Byrd argues there is no direct evidence in the record to support the state's claim that when Byrd said "gook" he meant "enemy soldier." He is correct. There is, however, indirect evidence. Byrd testified he enlisted in the army in 1968, received advanced individual training as a tank driver, was stationed in the United States, Viet Nam, and Germany, and served one year and two days in Viet Nam. Given the common—and unfortunate—parlance of the Viet Nam era, we accept the state's contention that the jury could infer Byrd was referring to enemy soldiers.

12. We are not here confronted with a situation in which the wartime behavior at issue amounts to a war atrocity, war crime, or behavior inconsistent with "the rules of war," and which could then justly be characterized as an "extrinsic offense" or a "bad act." In the case before us, there is no suggestion that Stephen Byrd acted in any way other than honorably during his Viet Nam tour of duty.

13. *Comber v. U.S.* (1990), D.C.App., 584 A.2d 26, contains an excellent and exceedingly thorough examination of the history of homicide and derivative crimes under the American legal system.

the front part of her body, but her nose was deformed and there was dirt in her eyes, nose, and mouth. There is evidence for a jury reasonably to believe that Byrd struck Chafin and pushed her face into the dirt, asphyxiating her. There is sufficient evidence to sustain the conviction of murder.

Reversed and remanded for a new trial consistent with this opinion.

ROBERTSON and SHARPNACK, JJ., concur.