UNITED STATES, Appellee,

v.

Alphonso O. HOUSER, Specialist
U.S. Army, Appellant.

No. 67,326.
CM 8901522.

U.S. Court of Military Appeals.

Argued Oct. 2, 1992.

Decided April 19, 1993.

For Appellant: *Captain David L. Thomas* (argued); *Lieutenant Colonel James H. Weise* and *Captain Michael P. Moran* (on brief).

For Appellee: *Major Samuel J. Smith, Jr.* (argued); *Colonel Dayton M. Cramer, Lieutenant Colonel Joseph A. Russelburg, Captain Donna L. Barlett* (on brief); *Lieutenant Colonel Daniel J. Dell'Orto* and *Major Kenneth T. Grant.*

## Opinion of the Court

CRAWFORD, Judge:

The issue in this case is whether the military judge erred in overruling a defense objection to the testimony of a government expert on rape trauma, when the expert had not interviewed the victim.

Appellant was convicted by general court-martial composed of officer and enlisted members of rape and adultery, in violation of Articles 120 and 134, Uniform Code of Military Justice, 10 USC §§ 920 and 934, respectively. He was sentenced to a dishonorable discharge, confinement for 40 years, and total forfeitures. The convening authority reduced the confinement to 30 years and otherwise approved the sentence. The Court of Military Review set aside the findings on adultery and affirmed the remaining findings and the approved sentence.

## FACTS

The victim, 15–year–old W, knew appellant's spouse for 9–10 years and appellant for 5 to 6 years. She stayed with appellant and his family during the first few weeks of August 1988 to care for their children. She looked upon appellant and his spouse as her uncle and aunt.

On the evening of August 6, 1988, appellant's spouse went out for the evening. W testified that she fell asleep watching TV in the den; and that appellant woke her and asked her why she was asleep. Thereafter, she fell back asleep. She was awakened with appellant on top of her inserting his penis into her vagina. W testified that she told him to get off and tried to push him away, but he pushed harder and penetrated her. Appellant pulled his penis out of W's vagina only when he heard his spouse's car pull up outside the home. He immediately ran upstairs and got into the shower.

Mrs. Houser knocked on the door and W got up, unlocked the door, and unlatched the chain to let her in. Mrs. Houser testified that she thought it was unusual that the door was chained. W did not immediately tell Mrs. Houser that she had been raped by appellant. Rather, she waited until appellant and Mrs. Houser had gone to bed and then went to the bathroom to wash herself off. The next morning W told Mrs. Houser what had happened. When confronted, appellant denied raping W both to his spouse and the victim.

In his opening statement civilian defense counsel raised questions concerning the victim's failure to report and to resist the alleged rape. He further commented that she did not appear anxious. Additionally, he conducted a rigorous cross-examination of W, questioning her about inconsistent acts and statements.

Shortly after this cross-examination, the prosecution offered in rebuttal the testimony of an expert, Dr. Pamela P. Remer, a counseling psychologist and associate professor at the University of Kentucky, to explain rape trauma syndrome to the members. The defense objected to this testimony on the grounds that it "would be more prejudicial than probative." Defense counsel argued Dr. Remer "has not seen or diagnosed the alleged victim, cannot say that she particularly has any symptoms of rape trauma syndrome." Moreover, the defense asserted that Dr. Remer's testimony "can only serve to confuse and mislead the panel."

Defense counsel went on to argue that "the only evidence that could help the jury is a qualified expert on rape trauma, who

has studied Ms. [W] and has diagnosed her condition, as consistent with rape trauma.... These charges are too serious to risk the jury deferring to the judgment of an expert who has no meaningful knowledge of this case." [1]

The judge overruled the defense objection and permitted Dr. Remer to testify. After the prosecution questioned Dr. Remer about her qualifications, the defense conceded that she was "an expert."

Dr. Remer testified as to six general stages of a rape trauma model. She labeled the first stage the "pre-rape stage" wherein: "Some of the common myths are things like that the victim is to blame, that rapes are committed by strangers." She continued:

The major picture under the rape myth is of a stranger coming up to a woman in a dark alley who rapes her at gun point, and the typical rapist is not like that at all. The typical rape is more likely to be by an acquaintance, about 60% of rapes are done by an acquaintance, that is someone the victim knows. They are more likely to be done indoors than outdoors, and often in the victim's home, or in someone's home. And so we don't have—in lots of cases we don't have a stranger doing something awful and brutal to a woman with the use of a weapon. Most rapes are [by] someone the victim knows, the threat of force and in a protected place.

\* \* \*

[If] it is more than a [sic] just a passing acquaintance, especially if she knows the rapist fairly well, there will usually be a good amount of trust in that relationship, and all of their interactions will be interpreted by the victim within that context of trust.... [I]n acquaintance rapes, when the victim and perpetrator [are] in a trusting relationship, the victim is much less likely to recognize she is in danger, because she will be viewing what

happens from the aspect of having trust in this person. So that is one thing that—also if you are in an environment that you deem to be safe, your own home, a friend's home, ... they are more likely not to recognize that it is a dangerous situation, because you have trust in the situation.

\* \* \*

When the attack itself starts, she would then have a period of trying to make sense of what is going on, especially an acquaintance rape, where it is not expected at all, or it is against what she would normally expect from this person. So there would be now and actually throughout a period of—or a lot of confusion on the victim's part about what is happening to me; and of trying to make sense about that. This is happening at the same time that the victim is trying to figure out what do I do, how do I get myself out of this situation. There may be a period of struggling here for victims. There usually is a point at which the victim makes the decision, or realizes that she is not going to be able to stop the rape....

Q. Might they experience some kind of paralysis or feeling of helplessness or—

A. About 45% of the victims in the recent survey that we did, said that they felt motionless; it is often described as a paralysis, [an] easy way to understand is being overwhelmed with fear and unable to move. And as I said, that coupled with the disassociation and the confusion makes it hard to respond.

Dr. Remer testified that the second stage "is the rape ... itself" and that the third stage is the "crisis stage and it is the immediate period that follows the rape."

She explained that during the third stage the victim is faced with getting her safety and "how is she going to go about handling the aftermath of the rape." Because of

---

**1.** We view the express objections in this case to be raised under Mil.R.Evid. 703 and Mil.R.Evid. 403, Manual for Courts–Martial, United States, 1984. We will address admissibility under Mil. R.Evid. 702. Rather than for us to guess, it would be far better if military judges would ask counsel to state the rule that constitutes the basis for the objection.

what the victim has read or watched on television or in the movies about victims being "to blame," it is "difficult to tell anybody." She continued:

> [V]ictims of acquaintance rapes are much less likely to tell anyone, to tell anyone at all, much less to tell more than one person. And again I think it is because the acquaintance rape doesn't fit society's myth of what rape is; and because the victim expects to be blamed for it more, because it doesn't fit that definition. So delays are not uncommon; delays of days, weeks, months, even can occur before the victim—and that some studies, a victim 10 years, 15 years later, have never told.

\* \* \*

Q. In the crisis stage ... what are the victim's reactions, what does she want to do?

Q. [Sic] Well, she is still in shock, and somewhat still in disbelief about what has happened to her; and, [there is] very much a sorting out process about what just happened. She will be feeling overwhelming amounts of fear still; afraid that the attacker might come back; afraid that she will be punished if she tells; afraid others will judge her; and, is just reliving often, over and over again in her own head the events of the attack that just took place; and, so that is the predominant reaction, is fear, and anxiety, and that leads to the victim not wanting to talk about what happened. There are two ends of a continuum, there is no one response to rape. I think one of the myths is we have is, that rape victims would be crying hysterically, and that is not the case. There are a variety of responses to rape. On one end of the continuum, would be a super controlled state; that is the victim showing absolutely no emotion; and in fact, she would be characterized by the lack of any emotion on her, be that kind of a [taut], not letting anything out, to the other end of the continuum which can be somebody crying uncontrollably, unable to talk to anybody, that kind of thing.

Q. Within the third stage, would it be uncommon or common that the person would feel unclean after an attack?

A. Another major response, again, I fail to hear from any survivor, in other words, all survivors have said this, that following an attack they feel very unclean; that they have a sense of the rapist being on them and around them, and of wanting to get clean; it is part of needing to put the rape behind them and it is also a part of needing to reaffirm, hey I'm me again, and so it is very common for survivors to bathe, shower, wash clothes. If the attack for instance, occurred in their apartment or something, they would tidy the place up, often, unless they know—get some directions from somebody, the police or rape crisis center that says don't touch anything. The human response, I think, is to get clean, to do something.

\* \* \*

Q. And in the second stage, would the victim's reactions to the rape be at all [a]ffected if the rape began while she was asleep?

A. Yes, and I'm going to hedge a little bit here, in terms of saying that it would depend on which stage of sleep the victim was awakened during [sic]. So there is some speculation here. But regardless of the stage of sleep, the victim would not have any forewarning of what was going to happen, if they were awakened while being raped. In other words, they wouldn't have any—see any behaviors of the other person that would give them warning about maybe I'm being in danger here; they wouldn't have any red flags to go for them. I think if a person is awakened out of sleep, again it doesn't matter what stage, they are going to be even more confused about what it is that is happening to me. And finally, if they are awakened in either REM sleep or in stage 4 of sleep, which is a deeper sleep, they are likely to be cognitively disoriented, have trouble processing their thoughts for a few moments, but it would add to the confusion that is nor-

mally a part of a rape, and if they are awakened in REM sleep they would even experience a temporary physical paralysis that all of us would experience if we are awakened while we are in REM sleep. That is, our body is unable—physically unable to respond for a few seconds.

Dr. Remer further explained that the third stage "lasts anywhere from a few minutes to up to a year, and it involves a bunch of crisis reactions by the victim in her immediate coping with rape." She also described the other stages. "The fourth stage is called a denial or a getting your life back together stage." The fifth stage is a "reliving stage." She testified that during this stage, there may be "flashbacks" to "the rape itself." She called the sixth stage "an intergration or resolution stage, and at this point the victim has resolved most of the negative issues that come from the rape...."

Dr. Remer then testified in response to hypotheticals as follows:

1. A good caretaker would not want the children "to witness the attack."

2. If there is "a trusting relationship," the victim would hesitate reporting the attack.

3. If the victim woke up during an attack, she might fail to resist.

4. The victim's first account may be distorted.

The concluding testimony was as follows:

Q. Doctor, if a person were experiencing the majority of the symptoms that you have talked about in your model, would they be suffering from a rape trauma syndrome?

A. Yes. Most likely. And it is the constellation of symptoms,....

\* \* \*

Some of the typical symptoms in the crisis stage are: I talked about the fear; it is very usual for clients to be—for clients—for victims to be depressed and under depression[;] there are a whole bunch of symptoms, including: often there will be a change in their eating habits, either they eat a whole lot more or they are eating a lot less. Often there will be a change in their sleeping pattern; inability to sleep, nightmares especially, or they are sleeping all the time, and then it is an avoidance of being awake and thinking about the rape that is happening there. They feel sad, that is a part of depression; feel hopeless about the future, often, or feel helpless. They usually have some loss of interest in activities or a loss of energy from their normal way of being; they may be suicidal. The third major area of problems in the crisis stage and then on throughout is, some kind of sexual dysfunction. In one study, 60% of the rape survivors had some kind of sexual difficulty at the time the study took place, so it may be even higher than that actually, if you kept measuring over time. There is usually a disruption in interpersonal relationships, that has to do with the ability to trust others; and I've already talked about work disruption. Those are the major ones.

Q. And again, if the person is experiencing the majority of those type of symptoms, would they be suffering from a rape trauma—

A. What you do is look for a constellation of symptoms, and then assess that in terms of how has this person [sic] from when the trauma occurred, how has this person changed, which makes the symptoms and—since the symptoms come from research on thousands of victims, you can make a reasoned assessment, that this person has been raped.

On cross-examination, Dr. Remer admitted that her model was different from the original rape trauma syndrome model set up by Burgess and Holstrom,[2] that there are a number of models, and that these models do not contradict her model. Dr. Remer did not evaluate the victim and in fact never met the victim. Dr. Remer admitted that the rape trauma syndrome was

**2.** Burgess & Holmstrom, *Rape Trauma Syndrome*, 131 Am.J. of Psychiatry 981 (1974).

not recognized in Diagnostic and Statistical Manual III. She also admitted that a number of the symptoms she had mentioned are caused by other disorders such as post-traumatic stress disorder and that many of these symptoms may also be the result of normal adolescent problems. She further testified that she did not know if the symptoms in her model were experienced by the victim and that she developed her model "to treat clients" so that she might "tailor" her counseling to better help what she termed "rape trauma survivors."

In its closing argument the prosecution said the following about Dr. Remer's testimony:

> Dr. Remer, talking about Dr. Remer, you heard her, she was qualified as an expert in rape trauma, and she—and you heard her testimony concerning that there is acceptable reactions to rape, concerning whether you scream out; how much you resist; what sort of symptoms you are going to exhibit afterwards and every one of the symptoms that defense talks about, Dr. Remer said it was a possible reaction and acceptable reaction to being raped.

The judge instructed the court members on assessing the credibility of expert witnesses (there were two) as follows:

> While Dr. Remer was qualified as an expert in the treatment of rape victims, and rape trauma, and she has testified concerning her model and the stages that victims go through and the need to look and see if there is a constellation of symptoms and then try to determine what is the cause for these symptoms.
>
> Now, these witnesses are known as expert witnesses, because their knowledge, skill, training, or education may assist you in understanding the evidence, or in determining a fact in issue. Now, you are not required to accept the testimony of an expert witness, or give it more weight than the testimony of an ordinary witness; but you should consider the qualifications of the expert as an expert witness.

> Now, during the course of her testimony, Dr. Remer answered several questions in regards to a hypothetical question. Now, when an expert witness answers a hypothetical question, the expert assumes [a]s true every asserted fact stated in that question. Therefore, unless you find that the evidence established the truth of the asserted facts in the hypothetical question, you cannot consider the answer of the expert witness to that hypothetical question.

## DISCUSSION

We now turn to the question of admissibility of Dr. Remer's testimony. For expert testimony to be admissible, certain factors must be established under the Military Rules of Evidence in Manual for Courts–Martial, United States, 1984: (A) the qualifications of the expert, Mil.R.Evid. 702; (B) the subject matter of the expert testimony, Mil.R.Evid. 702; (C) the basis for the expert testimony, Mil.R.Evid. 703; (D) the legal relevance of the evidence, Mil.R.Evid. 401 and 402; (E) the reliability of the evidence, *United States v. Gipson*, 24 MJ 246 (CMA 1987), and Mil.R.Evid. 401; and (F) whether the "probative value" of the testimony outweighs other considerations, Mil.R.Evid. 403. The burden is on the proponent to establish each of these factors.

■ In reviewing each of these factors, the standard on appeal is whether the military judge has abused his or her discretion. To establish this, appellant must come "forward with conclusive argument" that there was an abuse of discretion. *See United States v. Mukes*, 18 MJ 358, 359 (CMA 1984). As Judge Magruder once observed: "Abuse of discretion" is a phrase which sounds worse than it really is. All it need mean is that, when judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors.

Magruder, J, *The New York Law Journal* at 4, col. 2 (March 1, 1962), quoted in *Quote It II: A Dictionary of Memorable Legal Quotations* 2 (1988).

### A. Qualifications of the Expert

■ Mil.R.Evid. 702, like Fed.R.Evid. 702, provides that a witness may be qualified as an expert by reason of "knowledge, skill, experience, training, or education." The qualifications of the expert are to be determined by the trial court whose decisions are reviewable on appeal only for an abuse of discretion. *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962). *See also United States v. Stark,* 30 MJ 328, 330 (CMA 1990); *People v. Stoll,* 49 Cal.3d 1136, 265 Cal.Rptr. 111, 112, 783 P.2d 698, 699 (1989); *Byrd v. State,* 579 N.E.2d 457 (Ind.App. 1 Dist.1991).

Dr. Remer's qualifications are not at issue as defense counsel conceded that she was an expert.

### B. Subject Matter of Expert Testimony

■ Mil.R.Evid. 702 provides that the expert testimony is admissible when "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Mil.R.Evid. 702 is a very liberal standard. As was said regarding its twin Fed.R.Evid. 702: "[T]he test is not whether the jury could reach some conclusion in the absence of the expert evidence, but whether the jury is qualified without such testimony 'to determine intelligently and to the best possible degree the particular issue without enlightment from those having a specialized understanding of the subject....'" *State v. Chapple,* 135 Ariz. 281, 292–93, 660 P.2d 1208, 1219–20 (1983), *quoted in* P. Giannelli and E. Imwinkelried, *Scientific Evidence* § 5–2 at 152 (1986).

Our analysis would not be complete without a review of our prior case law. In *United States v. Carter,* 26 MJ 428 (1988), we held that "rape-trauma syndrome evidence is probative ... on the issue of consent by the victim...." *Id.* at 429. In *Carter,* the Government qualified an expert on the treatment of rape victims to testify on "rape trauma syndrome," as a type of post-traumatic stress disorder (PTSD). The expert testified that she diagnosed the victim as having PTSD and the victim manifested rape trauma syndrome. *See* 22 MJ 771, 772 (ACMR 1986).

In *United States v. Reynolds,* 29 MJ 105, 111 (CMA 1989), we held that "the plain rule of law is that an expert's testimony concerning 'rape-trauma syndrome'" was admissible.

In *United States v. Peel,* 29 MJ 235, 241 (CMA 1989), *cert. denied,* 493 U.S. 1025, 110 S.Ct. 731, 107 L.Ed.2d 750 (1990), we held it was permissible for an expert to testify that the victim's failure immediately to report the crime "was not inconsistent behavior for a rape victim" and that a victim may act as if the rape never happened.

Occasionally, this evidence has been limited to presentation by rebuttal. *See, e.g., People v. Bledsoe,* 36 Cal.3d 236, 203 Cal. Rptr. 450, 459, 681 P.2d 291, 300 (1984); *United States v. Peel, supra* (evidence introduced in response to cross-examination of victim); *United States v. Carter, supra* (evidence introduced during Government's rebuttal).

In a parallel area, child sexual abuse, we have permitted experts to testify about the behavior of child victims of sexual abuse. *See, e.g., United States v. Suarez,* 35 MJ 374, 376 (CMA 1992) (why a child may render inconsistent statements, recant allegations, fail to report or delay reporting abuse); *United States v. Nelson,* 25 MJ 110 (CMA 1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988). Such testimony assists jurors in disabusing themselves of widely held misconceptions. Likewise, where there is a long-term relationship between the suspect and the victim, he or she is less likely to report the crime or appear upset. *See People v. Taylor,* 75 N.Y.2d 277, 552 N.Y.S.2d 883, 890, 552 N.E.2d 131, 138 (1990).

Thus rape-trauma-syndrome testimony by a properly qualified expert may be ad-

missible to assist the trier of fact to understand the evidence. While in some cases it may be preferable that the prosecution wait until rebuttal, this Court has never limited rape-trauma-syndrome evidence to rebuttal because this would shift the focus to the question of appropriate rebuttal.[3]

### C. Basis for Expert Testimony

■ Under Mil.R.Evid. 703, like Fed. R.Evid. 703, an expert's opinion may be based upon personal knowledge, assumed facts, documents supplied by other experts, or even listening to the testimony at trial. *See generally United States v. Johnson,* 35 MJ 17, 18 (CMA 1992). Thus, there was no requirement for Dr. Remer to interview the victim before she could testify as to her six-stage model and the symptoms of typical rape survivors.

### D. Relevance

■ Section IV of the Military Rules of Evidence defines legal and logical relevancy. Mil.R.Evid. 401 provides that the evidence is logically relevant if the evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Certain behavioral patterns such as failure to resist or delay in reporting a rape could be confusing to the factfinders because these may be counter-intuitive. *See generally United States v. Suarez, United States v. Johnson,* and *United States v. Peel,* all *supra, see,* 36 MJ at 398. It is logically relevant for an expert to explain that certain behavior patterns occur in a certain percentage of rape cases or

child abuse cases. *Id.* This is not to say that the offense occurred but, rather, that these events may happen to some victims. Without the testimony the members are left with their own intuition. For these reasons we conclude that Dr. Remer's testimony was relevant.

### E. Reliability

■ In *United States v. Gipson,* 24 MJ 246 (CMA 1987), this Court indicated that the test enunciated in *Frye v. United States,* 293 F. 1013 (D.C.Cir.1923), has been superseded by the relevance approach. This approach looks at Mil.R.Evid. 401 to determine that the evidence is relevant to a consequential fact in the case. The probative value of the evidence under this test depends on its reliability. Since most judges do not have the appropriate scientific background, it is up to the proponent to establish the probative value and the reliability of the evidence by testimony or scientific and legal writings. *State v. Cavallo,* 88 N.J. 508, 443 A.2d 1020, 1027 (1982). *See also United States v. Banks,* 36 MJ 150, 164 n. 15 (CMA 1992); *United States v. Johnson, supra* at 18. It is appropriate to determine whether the evidence embraces a new technique or theory and the potential rate of error, as well as the existence of any specialized literature and cases on the subject. We do not need to address this issue because the reliability of Dr. Remer's testimony was not challenged.

### F. Probative Value

■ Logically relevant and reliable expert testimony "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of

---

3. *Cf. United States v. Trimper,* 28 MJ 460, 467 (CMA), *cert. denied,* 493 U.S. 965, 110 S.Ct. 409, 107 L.Ed.2d 374 (1989), where this Court stated:
Thus, if a witness makes a broad collateral assertion on direct examination that he has never engaged in a certain type of misconduct or if he volunteers such broad information in responding to appropriately narrow cross-examination, he may be impeached by extrinsic evidence of the misconduct.
*See also United States v. Pantone,* 609 F.2d 675, 683 (3d Cir.1979); *United States v. Bowling,* 16 MJ 848 (NMCMR 1983). In contrast in *Unit-*

*ed States v. Havens,* 446 U.S. 620, 627, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980), the Supreme Court stated:
In terms of impeaching a defendant's seemingly false statements with his prior inconsistent utterances or with other reliable evidence available to the government, we see no difference of constitutional magnitude between the defendant's statements on direct examination and his answers to questions put to him on cross-examination that are plainly within the scope of the defendant's direct examination.

the issues, or misleading the members." Mil.R.Evid. 403.

In determining whether the military judge abused his discretion in balancing probative value with the potential for unfair prejudice, we must examine Dr. Remer's testimony in the context of the entire case. The defense in its opening statement raised issues concerning a number of acts conceivably inconsistent for a victim of rape, e.g., the victim's failure to report, her failure to resist, and her apparent lack of anxiety. Additionally, trial defense counsel conducted a rigorous cross-examination of the victim during which he further questioned her behavioral conduct. Following this, trial counsel sought to introduce the expert testimony of Dr. Remer to put the behavioral evidence in perspective. Thus the Government argued that Dr. Remer's testimony was necessary to explain to the members the behavioral patterns of victims of rape.

Additionally, Dr. Remer's testimony was offered in rebuttal after the behavioral conduct of the victim was raised as an issue. The Government was careful to put her testimony into a proper framework for the members. The doctor was very careful not to confuse or mislead the court members. She did not testify that if certain behavioral conduct was present, a rape took place. She did, however, testify that in some rape cases the victim would fail to report the offense immediately, fail to resist and show no appearance of anxiety. Dr. Remer made it clear that her testimony was to give a framework within which to consider the arguments made by the defense in the context of what happens in some rape cases, but she would not usurp the role of the factfinder. Specifically, in order to avoid confusing the jury, she testified that she was seeking to aid the court members, but they had to determine whether an offense was committed. Furthermore, Dr. Remer did not violate our prohibition against expert witnesses' testifying about

the credibility of the victim. *See, e.g., United States v. Harrison,* 31 MJ 330 (CMA 1990).

Additional factors were present that militate against a finding of unfair prejudice to appellant.[4] Trial defense counsel conducted an extensive cross-examination of Dr. Remer to further place her testimony in perspective. The Government's closing argument reinforced her testimony by arguing that "there [are] acceptable reactions to rape, concerning whether you scream out; how much you resist; what sort of symptoms you are going to exhibit afterwards...." Finally the judge instructed the court members that it was their decision to determine Dr. Remer's credibility. He said that "you are not required to accept the testimony of an expert witness, or give it more weight than the testimony of an ordinary witness...."

We conclude that the judge did not abuse his discretion in admitting Dr. Remer's testimony.

The decision of the United States Army Court of Military Review is affirmed.

Judge COX concurs.

SULLIVAN, Chief Judge (concurring):

I agree with the principal opinion in this case as well as the comment of Judge Wiss.

WISS, Judge (concurring):

I fully concur in the principal opinion and write only to comment on two aspects of it.

Analogizing testimony regarding rape-trauma syndrome to testimony about child sexual abuse, *see United States v. Suarez,* 35 MJ 374 (CMA 1992); *United States v. Nelson,* 25 MJ 110 (CMA 1987), *cert. denied,* 484 U.S. 1061, 108 S.Ct. 1016, 98 L.Ed.2d 982 (1988), the principal opinion concludes that evidence of rape-trauma syndrome is not necessarily limited to rebuttal * and may be introduced during the

---

4. Two other techniques were available to minimize this evidence: voir dire and the judge's limiting the evidence to rebuttal. *See* Mil. R.Evid. 611(a).

* By "rebuttal," the principal opinion apparently means both the prosecution's case in rebuttal, following the defense's case-in-chief, as well as testimony during the prosecution's case-in-chief

prosecution's case-in-chief. That is not an issue here, since Dr. Remer's testimony came in during the prosecution's case-in-chief but in obvious rebuttal to implications raised during the defense's earlier cross-examination of the prosecutrix. *See* n. 1, *supra.* However, I have no quarrel with that conclusion. *Cf. Estelle v. McGuire,* — U.S. ——, —— ——, 112 S.Ct. 475, 483–84, 116 L.Ed.2d 385 (1991).

I do caution, though, that relevance of testimony on rape-trauma syndrome seems to be limited to issues of whether there was consent and whether a rape did, in fact, occur. *See* McCord, *The Admissibility of Expert Testimony Regarding Rape Trauma Syndrome in Rape Prosecutions,* 26 B.C.L.Rev. 1143, 1197 (1985), *cited in United States v. Carter,* 26 MJ 428, 429 (CMA 1988). Where one or the other or both are in dispute in the trial, it would seem unimportant when, during the trial, such expert testimony was offered. If, however, the trial revolves solely around the identity of the rapist, for example, the military judge should be especially cautious to ensure that the marginal probative value of rape-trauma-syndrome testimony under those circumstances is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the members...." Mil.R.Evid. 403, Manual for Courts–Martial, United States, 1984. *See United States v. Hebert,* 35 MJ 266, 270 (CMA 1992) (Wiss, J., concurring in part and in the result); *United States v. Warren,* 6 USCMA 419, 423, 20 CMR 135, 139 (1955).

As to the defense argument that Dr. Remer's testimony should be excluded because she had not personally seen or treated the prosecutrix, it seems to me that there is a good deal of logic to the suggestion offered by the Army Court of Military Review in *United States v. Carter,* 22 MJ 771, 773 n. 3 (1986), that reflects the contrary view as follows:

that follows—and rebuts—evidence elicited during cross-examination by the defense. *See United States v. Peel,* 29 MJ 235, 240 (CMA 1989),

We believe the better practice would be to have the treating medical personnel testify as to the victim's emotional, physical and mental state and have another individual, properly qualified as an expert, testify as to the various aspects of rape trauma syndrome and whether the victim's symptoms are consistent with rape trauma syndrome.

Such an expert, appropriately distanced from the alleged victim, is in a position to offer truly objective assistance for the factfinders, with a substantially reduced risk of a subconscious suggestion creeping into the testimony that the expert believes the victim.

GIERKE, Judge (concurring in the result):

I agree with the principal opinion that if placed in a proper, limited framework, expert testimony on the rape trauma syndrome is admissible to aid the factfinder in understanding the evidence and to rebut any misconceptions about a rape victim's behavior. *See United States v. Suarez,* 35 MJ 374 (CMA 1992). However, I take exception to the principal opinion's conclusion that Dr. Remer's expert testimony was placed into a proper framework by the Government. In my opinion, Dr. Remer was allowed to go too far in expressing her opinion that if certain behavioral conduct was present a rape took place. Considering the fact that this behavioral conduct matched that attributed to the victim, this conclusion was unfairly prejudicial, not very probative, and very misleading. Mil. R.Evid. 403, Manual for Courts–Martial, United States, 1984.

The record clearly indicates that trial counsel wanted more from Dr. Remer's testimony than simple use as rebuttal to explain the behavioral patterns of rape victims. The victim's mother and the victim testified on direct examination that, after the alleged rape, the victim cried a lot, had trouble sleeping, lost her appetite, and often had nightmares and flashbacks. Trial

*cert. denied,* 493 U.S. 1025, 110 S.Ct. 731, 107 L.Ed.2d 750 (1990).

counsel also proffered testimony of the victim's high school counselor who was to discuss the "symptoms" the victim was exhibiting following the alleged rape and her impressions of how the victim was dealing with those symptoms. These "symptoms" included the victim's admission to her that she still had trouble concentrating and sleeping, bad dreams, flashbacks, and a loss of appetite. After a defense objection, trial counsel argued that the "impressions" of the counselor "are relevant in that they provide the basis for whether she ... [the victim] was experiencing rape trauma syndrome or post-traumatic trauma syndrome...." Noting that the counselor's testimony "would be cumulative with the prior testimony," the military judge disallowed her testimony.

Next, defense counsel objected to Dr. Remer's testimony, arguing, *inter alia*, that "Dr. Remer's testimony in this particular case would be more prejudicial than probative.... [It] will mislead the jury and invade the factfinding providence of the jury." Without comment, the military judge overruled the objection and allowed Dr. Remer to testify as an expert on the rape trauma syndrome. Dr. Remer testified about general "symptomatic" behavioral traits of women who have been raped and answered "hypothetical" questions that identically matched the victim's testimony concerning her behavior immediately following the rape. Trial counsel concluded his questioning of Dr. Remer by asking her "if a person were experiencing the majority of these symptoms that you have talked about in your model, would they [sic] be suffering from a rape trauma syndrome?" Dr. Remer responded by saying, "Yes, most likely," and reminded trial counsel that she had not "finished telling" the members about the typical "constellation of symptoms." Not so coincidentally, she indicated that typical symptoms in the crisis stage of the rape trauma syndrome include "a change in ... eating habits" (they eat more or eat less); "a change in ... sleeping pattern" (they cannot sleep, have nightmares, or sleep all the time); depression (sadness, hopelessness); and

"sexual dysfunction." Upon being asked again by trial counsel whether a person suffering from a majority of these "symptoms" would be suffering from rape trauma, Dr. Remer again suggested a "yes" answer and explained that upon examination of "a constellation of symptoms" and how a person has changed after a trauma, one "can make a reasoned assessment, that this person has been raped."

In my opinion, this is not limited, permissible testimony. It improperly allowed the members to infer that, if they believed that the victim exhibited certain behavioral conduct after an incident, then they could conclude she had been raped. The generalized behavioral characteristics attributed to the victim and labeled as rape trauma "symptoms" could result from any number of stressful situations. *See generally State v. Taylor*, 663 S.W.2d 235 (Mo.1984) (en banc). The rape trauma syndrome was developed from interviewing "thousands of victims" to help them better cope with the aftermath of their victimization. It presupposes the existence of a rape. It was not developed to determine whether a rape had, in fact, occurred. *Id.* at 238. *See People v. Bledsoe*, 36 Cal.3d 236, 203 Cal.Rptr. 450, 681 P.2d 291 (1984). Dr. Remer's conclusion that one can reasonably assess that a person has been raped based on "a constellation of symptoms" (a majority of which the victim possessed) "has meager scientific basis and minimum value but has substantial potential for misleading the factfinder." *United States v. Cameron*, 21 MJ 59, 65 (CMA 1985). *Cf. State v. Taylor*, *supra* (fact that victim exhibited symptoms of rape trauma syndrome does not qualify expert to designate experience that gave rise to trauma). Moreover, contrary to the holding of the principal opinion, I do not believe that standard instructions of the type given in this case on the weight members may give to testimony of expert witnesses are adequate to protect against unfair prejudice to an accused. Such instructions place absolutely no parameters on

*how* evidence of the rape trauma syndrome should be considered by the members.

Despite my belief that the military judge allowed the Government to improperly use expert testimony on the rape trauma syndrome, I would hold that his error was harmless under the unique circumstances of this case. Art. 59(a), Uniform Code of Military Justice, 10 USC § 859(a). *Cf. People v. Bledsoe, supra* (improper use of rape trauma syndrome to prove a rape occurred not prejudicial in light of remaining evidence against defendant). Trial counsel did not highlight Dr. Remer's improper conclusion in his closing argument. Appellant's defense was that he never had sexual intercourse with the victim and that she created the whole story. Yet, the victim's allegations were corroborated by medical evidence indicating that she suffered recent injuries caused by forceful penetration of her vagina. The victim, a 15–year–old girl, had no apparent motivation to make up her very plausible allegations. Therefore, I would hold that any error in allowing Dr. Remer's testimony *in toto* was harmless.