# UNITED STATES NAVY-MARINE CORPS
# COURT OF CRIMINAL APPEALS
# WASHINGTON, D.C.

**Before**
**R.Q. WARD, J.R. MCFARLANE, K.M. MCDONALD**
**Appellate Military Judges**

**UNITED STATES OF AMERICA**

**v.**

**GRIFFIN J. CHRASTINA**
**INTELLIGENCE SPECIALIST SEAMAN RECRUIT (E-1), U.S. NAVY**

**NMCCA 201200464**
**GENERAL COURT-MARTIAL**

**Sentence Adjudged:** 13 July 2012.
**Military Judge:** CAPT Tierney Carlos, JAGC, USN.
**Convening Authority:** Commander, Navy Region Europe, Africa, Southwest Asia.
**Staff Judge Advocate's Recommendation:** CDR J.A. Link, JAGC, USN.
**For Appellant:** LT David Dziengowski, JAGC, USN.
**For Appellee:** LT Ann Dingle, JAGC, USN.

**25 February 2014**

---------------------------------------------------------
**OPINION OF THE COURT**
---------------------------------------------------------

**THIS OPINION DOES NOT SERVE AS BINDING PRECEDENT, BUT MAY BE CITED AS PERSUASIVE AUTHORITY UNDER NMCCA RULE OF PRACTICE AND PROCEDURE 18.2.**

WARD, Senior Judge:

A military judge sitting as general court-martial convicted the appellant of involuntary manslaughter and aggravated assault of a child in violation of Articles 119 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 919 and 928.[1]  The military judge

---

[1] This case is the second of the appellant's two general courts-martial following his successful pretrial severance motion.  In the first trial, *Chrastina I*, a panel of members with enlisted representation convicted the appellant, contrary to his pleas, of indecent acts under Article 120, UCMJ,

sentenced the appellant to fifteen years' confinement and a dishonorable discharge.  In accordance with a pretrial agreement, the convening authority (CA) suspended all confinement in excess of eleven years and, except for the dishonorable discharge, ordered the sentence executed.

The appellant raises five assignments of error.[2]

## Factual Background

This is an infant death case.  Assigned to a joint command in southern England, the appellant lived off base with his wife and the couple's five-week-old baby girl, Madeline.  Two weeks before her death, the appellant was home alone with Madeline. According to his providence inquiry, after changing her diaper and attempting to swaddle her, he applied "too much pressure against her while she was on her side," and then "heard a pop." Record at 667.  The appellant neither sought medical attention for Madeline nor said anything when his wife came home.  A post-mortem examination conducted several weeks later revealed this "pop" was the sound of three of Madeline's ribs breaking.

Approximately two weeks later, the appellant was again home alone with Madeline.  In a sequence of events he described to the military judge, he first noticed sounds from Madeline

---

and sentenced him to be reduced to pay grade E-1.  In the instant case, *Chrastina II*, the appellant elected trial by military judge alone and pleaded guilty to aggravated assault of a child and negligent homicide, the latter in violation of Article 134, UCMJ.  After the military judge accepted the appellant's guilty pleas, a contested trial proceeded on the greater offense of involuntary manslaughter.

[2] (1) That the appellant's confinement conditions at U.S. Air Force Correctional Facility at Royal Air Force Station Lakenheath, England were unlawful under Article 55, UCMJ, and the Eighth Amendment because the appellant was deprived of his right to counsel and repeatedly threatened and harassed by guards;

(2) That the military judge erred when he admitted expert testimony over defense objection;

(3) That the evidence for the involuntary manslaughter conviction is legally and factually insufficient;

(4) That the appellant was deprived of his constitutional right to confrontation when the military judge denied his request to explore bias of his wife (raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982); and

(5) That the appellant was deprived of a fair and impartial military judge when the same judge presided over both trials in *Chrastina* I and II (raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982)).

indicating she had spit up and was choking. *Id.* at 682-83. He picked her up and took her to the changing table to have a flat surface. He explained that he initially tried to perform rescue breathing, but since she still struggled to breathe, he attempted to "clear her airway." *Id.* at 682. He then raised his hand past his ear and struck her twice on the abdomen with the "butt of his hand." *Id.* at 682, 684. He finally called British emergency services and reported that his daughter was not breathing and appeared to be choking.

British paramedics responded within minutes to find Madeline in full cardiac arrest with a clear airway. *Id.* at 1082-84. They quickly evacuated her to a nearby hospital, but doctors were unable to re-establish her heartbeat and she was subsequently declared dead. The attending pediatrician observed a catastrophic injury to her abdomen, causing it to fill with air. At a deposition later played at trial, the pediatrician testified that Madeline was effectively dead upon arrival. *Id.* at 1126, 1130. Throughout the time when paramedics were on scene at the residence and later at the emergency room, the appellant never mentioned to anyone that he struck Madeline's abdomen.

British authorities subsequently performed two post-mortem examinations. The first revealed that Madeline suffered a perforation within the small intestine not caused by any natural means. The second examination, conducted by Dr. Nathaniel Cary, a forensic pathologist, also revealed a perforation in the small intestine. Dr. Cary concluded that the cause of death was severe blunt force trauma to the abdomen. *Id.* at 1319-20. Additional analysis was conducted by a histopathologist, Professor Archibald Malcolm. Professor Malcolm concluded that Madeline had also sustained three rib fractures caused by significant force three weeks prior to her death. Prosecution Exhibit 12 at 2, 6.

British police conducted an initial investigation. About a week following Madeline's death, they questioned the appellant and he again failed to mention that he had struck Madeline. Record at 822; PE 1. After the post-mortem examinations, British police arrested the appellant and his wife for suspected infanticide and interrogated both at length. Although police confronted him with the post-mortem findings, the appellant refused to admit to striking Madeline or squeezing her several weeks earlier. Record at 835-41. The Naval Criminal Investigative Service (NCIS) eventually assumed investigative jurisdiction and re-interrogated the appellant. After a lengthy

3

interrogation, the appellant finally admitted to squeezing Madeline while swaddling her, and admitted to striking her twice on the abdomen. *Id*. at 928-34.

During the guilty plea inquiry, the appellant acknowledged that his blows to Madeline's abdomen caused her death. *Id*. at 682, 692, 696-98. Furthermore, he admitted his use of force was excessive, not what a reasonable person would have done, and that he would not have struck her had he exercised due care. *Id*. at 686-94. In light of his guilty plea to negligent homicide, the only remaining issue in dispute for the greater offense of involuntary manslaughter was whether he acted with culpable negligence.[3]

**Analysis**

1. <u>Legal and Factual Sufficiency</u>

The appellant argues that his involuntary manslaughter conviction is legally and factually insufficient because his actions "amount[ed] to nothing more than simple negligence" in an attempt to save his daughter's life. Appellant's Brief of 15 Apr 2013 at 39. We disagree.

We review questions of legal and factual sufficiency *de novo*. *United States v. Winckelmann*, 70 M.J. 403, 406 (C.A.A.F. 2011). We review the legal sufficiency of the evidence by determining "whether, considering the evidence in the light most favorable to the prosecution, any reasonable fact-finder could have found all the essential elements beyond a reasonable doubt." *United States v. Day*, 66 M.J. 172, 173-74 (C.A.A.F. 2008) (citation omitted). We review factual sufficiency by determining whether "after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, [we are] convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N.M.Ct.Crim.App. 2006), *aff'd*, 64 M.J. 348 (C.A.A.F. 2007) (citations omitted).

Despite his current claims that he thought Madeline was choking, British paramedics at the scene found her airway clear with no signs of any vomitus. Record at 1083. The appellant also admitted to NCIS agents that two weeks before Madeline's

---

[3] The military judge explained to the appellant that his "plea of guilty admitted every element of involuntary manslaughter except that the act amounted to culpable negligence and that [Madeline] was a child under the age of 16," although the latter fact was not in dispute. Record at 721.

death he squeezed her out of frustration so hard he heard a "pop." *Id*. at 928-33. Even with this stark reminder of her fragility, two weeks later he struck her so hard as to rupture her small intestine and cause her death. *Id*. at 669-70. He never told anyone that day, either at the scene or at the hospital, what he had done. We are convinced beyond a reasonable doubt that the appellant acted with a "culpable disregard for the foreseeable consequences" of striking Madeline. MANUAL FOR COURTS-MARTIAL, UNITED STATES (2008 ed.), Part IV, ¶ 44c(2)(A)(1). Furthermore, considering the evidence in a light most favorable to the prosecution, we are convinced that a reasonable fact-finder could have found the same. *Day*, 66 M.J. at 173-74.

2. Expert Testimony of Doctor Cary

During the contested portion of trial, the Government called Dr. Nathaniel R. Cary, the forensic pathologist who conducted the autopsy of Madeline. When trial counsel offered him to the court as an expert in forensic pathology, trial defense counsel questioned Dr. Cary on his familiarity with and use of biomechanics in general, and with respect to the autopsy of Madeline. Record at 1286-90. Trial defense counsel then objected to any testimony by Dr. Cary on the level of force involved due to the lack of any familiarity with biomechanics or biomechanical consultation. *Id.* at 1290.[4] The military judge overruled the defense objection, finding that any perceived shortcomings in these areas could be adequately explored on cross-examination. Dr. Cary then explained that he typically classified force into three categories: mild, moderate and severe; and opined that Madeline's fatal injuries were the result of "severe force." *Id*. at 1315-18.

The appellant argues that the military judge erred as Dr. Cary's lack of qualifications in biomechanics and failure to consult with a biomechanical engineer rendered his opinion on the level of force involved unreliable. We review a military judge's ruling on the admissibility of expert testimony for an abuse of discretion. *United States v. Houser*, 36 M.J. 392, 397 (C,M.A. 1993). In performing the function of "gatekeeper" in this area, a military judge considers "(1) the qualifications of the expert; (2) the subject matter of the expert testimony; (3) the basis for the expert testimony; (4) the legal relevance of

---

[4] According to Dr. Cary, biodynamics or biomechanics is a separate and distinct field from forensic pathology. It is the quantitative "study of the application of force on the body." Record at 1287.

the evidence; (5) the reliability of the evidence; and (6) that the probative value of the testimony outweighs other considerations outlined in M.R.E. 402." *United States v. Billings*, 61 M.J. 163, 166 (C.A.A.F. 2005) (citing *Houser*, 36 M.J. at 397).

After examining Dr. Cary's answers during *voir dire* and the remainder of his testimony, we conclude that the military judge did not abuse his discretion. Dr. Cary testified that his field of forensic pathology "obviously incorporates considering forces and the [force's] involvement in injury." Record at 1288. In addition to quantifying force "in a simple three point scale of mild, moderate, and severe," he also testified that he places force in context of whether "forces are likely to be developed in an immobile infant" and what forces are associated with particular acts. *Id*. at 1289. He explained that his assessments of force are "custom and practice within forensic pathology," and he provided contextual examples on what constitutes mild, moderate, or severe force. *Id*. at 1289-90, 1317-20. During cross-examination, he testified that a biomechanical study in the case of Madeline "would not be the norm" because an "immobile infant is not going to develop this injury themselves." *Id*. at 1382-83. Trial defense counsel offered no treatise, study, or data impeaching Dr. Cary's opinion as unreliable for lack of biomechanical consultation.[5] Accordingly, we find no abuse of discretion by the military judge.

3. <u>The Appellant's Treatment in Confinement</u>

---

[5] During the defense case, trial defense counsel called Dr. Ophoven, a forensic pediatric pathologist from the United States. She agreed with Dr. Cary on the cause of death, blunt force trauma. However, she testified that based on her review she could not render an opinion on the level of force behind the blunt force trauma because "the amount of force required to cause damage in the bowel has many variables." Record at 1466. Furthermore, she testified that she had "never heard" of Dr. Cary's classifications of force as mild, moderate or severe. *Id*. at 1469. She also testified that generally when levels of force involved are at issue, she would seek the expertise of someone in biomechanics to determine "whether or not the event was plausible." *Id*. at 1471. We are not persuaded that Dr. Ophoven's testimony rendered Dr. Cary's opinion on the level of force unreliable. Trial defense counsel never asked whether Dr. Ophoven agreed with Dr. Cary's assessment that biomechanical consultation was unnecessary in the instant case because of the lack of any competing forces involved with an immobile infant. Although Dr. Ophoven expressed a preference for biomechanical engineering consultation in general, she offered no explanation how any such consultation was necessary to determine the level of force involved in this case. We agree with the military judge that these were matters more appropriate for cross-examination.

6

Following trial, the appellant was initially confined at the U.S. Air Force Correctional Facility (USAF-CF) located at Royal Air Force Station (RAF) Lakenheath, England. After approximately six weeks, he was transferred to the U.S. Disciplinary Barracks at Fort Leavenworth, Kansas. During his brief incarceration at USAF-CF, he alleges several instances of mistreatment by guards or officials there that violated his rights under the Eighth Amendment and Article 55, UCMJ. We disagree. His principal complaints are that guards seized his privileged documents folder during a search of his cell and that prison officials at his Discipline and Adjustment Board (D & A Board) threatened to vacate the suspended portion of his sentence. He also alleges that the D & A Board ultimately vacated 480 days of "good conduct time" that he would have accrued over the course of his sentence. For relief, he urges us to disapprove 480 days of confinement from his approved sentence.

Even assuming that the appellant's allegations are true, we are not persuaded by his claims of "cruel and unusual" punishment. To be viable, an Eighth Amendment/Article 55, UCMJ, claim must satisfy both an objective and subjective component. *United States v. White*, 54 M.J. 469, 474 (C.A.A.F. 2001). "First, there is an objective component, where an act or omission must result in the denial of necessities and is 'objectively, sufficiently serious.'" *Id. (*quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Second, there must exist subjectively a "culpable state of mind" on behalf of a government agent. *Id.* This culpable state of mind is a "'deliberate indifference to inmate health or safety.'" *Id.* (quoting *Farmer,* 511 U.S. at 832). Government actors' indifference is evidenced by continuing to act despite the harm or risk of harm to the inmate. *United States v. Sanchez*, 53 M.J. 393, 396 (C.A.A.F. 2000). Intimidation, threats, or ransacking a prisoner's cell are not *per se* Eighth Amendment violations. *White*, 54 M.J. at 474. We review *de novo* whether the treatment asserted by the appellant constitutes "cruel and unusual treatment" under the Eighth Amendment and Article 55, UCMJ. *Id*. at 471.

Undertaking an objective analysis, we find that the appellant's allegations, if true, did not deny him any "life necessities."[6] We note that he "regularly communicated with his

---

[6] *Cf*. *Hope v. Pelzer*, 536 U.S. 730 (2002) (finding that handcuffing a shirtless inmate outside to a hitching post while denying him adequate water and causing a severe sunburn resulted in an Eighth Amendment violation);

trial defense counsel" after the court-martial. Appellant's Brief at 23. Moreover, the crux of the appellant's complaint of "psychological harm" stems from the alleged threats by officials at the USAF-CF to vacate 480 days "good time credit" and vacate his suspended sentence. But nowhere in the record is there any sign that suspended punishment was actually vacated. Likewise, there is no evidence that any "good time credit" was actually vacated.[7] The record similarly contains no evidence that the appellant sought or was treated for any realized physical or mental condition stemming from these alleged incidents. Consequently, we conclude that the appellant has failed to meet his burden of establishing a violation of his rights under Article 55, UCMJ and/or the Eighth Amendment.

## 4. Remaining Assignment of Errors

Having reviewed the record, we find no merit in the appellant's remaining assignment of errors. *United States v. Clifton*, 35 M.J. 79 (C.M.A. 1992).

**Conclusion**

The findings and the sentence as approved by the CA are affirmed.

Judge MCFARLANE AND Judge MCDONALD concur.

For the Court

R.H. TROIDL
Clerk of Court

---

*Foster v. Runnels*, 554 F.3d 807 (9th Cir. 2009) (denial of meals*); Mandel v. Doe*, 888 F.2d 783 (11th Cir. 1989) (denial of medical attention); *Washington v. Dugger*, 860 F.2d 1018 (11th Cir. 1988) (denial of medical attention).

[7] On 15 Aug 2013, we granted the appellant's Nonconsent Motion to Attach. However, these additional materials offered by the appellant fail to substantiate whether the alleged threats to remove the appellant's credit for "good time" or vacate his suspended sentence ever materialized.