# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

_____

## No. 201700039

_____

### UNITED STATES OF AMERICA
Appellee

v.

### SHERMAN O. ROLLINS
Chief Machinist's Mate (E-7), U.S. Navy
Appellant

_____

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Commander Heather Partridge, JAGC, USN.
Convening Authority: Commander, Navy Region Mid-Atlantic, Norfolk, VA.
Staff Judge Advocate's Recommendation: Lieutenant Commander Anthony P. Sham, JAGC, USN.
For Appellant: James S. Trieschmann, Jr., Esq.; Commander Donald R. Ostrom, JAGC, USN.
For Appellee: Major Kelli A. O'Neil, USMC; Lieutenant Megan P. Marinos, JAGC, USN.

_____

Decided 30 July 2018

_____

Before WOODARD, MARKS,[1] and JONES, *Appellate Military Judges*

_____

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

_____

---

[1] Senior Judge Marks took final action in this case prior to detaching from the court.

WOODARD, Chief Judge:

Officer and enlisted members sitting as a general court-martial convicted the appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012).[2] The members sentenced the appellant to six years' confinement and a dishonorable discharge. The convening authority approved the adjudged sentence and, except for the dishonorable discharge, ordered it executed.

The appellant asserts five assignments of error (AOE): (1) the military judge abused her discretion by refusing to abate the proceedings after the victim refused to be interviewed pretrial by the defense; (2) the military judge abused her discretion by admitting hearsay; (3) his conviction is factually insufficient; (4) the military judge abused her discretion by allowing the victim to provide unsworn testimony during the sentencing proceeding; and (5) the non-unanimous members findings violated his Sixth Amendment rights.[3] We conclude the findings and sentence are correct in law and fact and find no error materially prejudicial to the appellant's substantial rights. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

On 22 November 2014, the victim, Private First Class (PFC) KS,[4] traveled to Norfolk, Virginia, to visit her sister-in-law, Personnel Specialist Second Class (PS2) AS, and attend PS2 AS's birthday party. PFC KS and PS2AS arrived at the party between 2230 and 2300. The appellant also attended the party.

The appellant and PFC KS had never met. After introducing PFC KS to the appellant, PS2 AS instructed him to leave PFC KS alone—and that "she was off limits"—because she was married to PS2 AS's brother.[5]

While at the party, PFC KS and the appellant had limited interaction. The party ended sometime around midnight, and PFC KS, PS2 AS, DW (PS2 AS's boyfriend), the appellant, and several others from the party went to PS2 AS's apartment to drop off the gifts, cake, and other party supplies before the group headed back out to continue celebrating. PFC KS rode to the apartment with

---

[2] The appellant was acquitted of one specification of rape in violation of Article 120(a)(1), 10 U.S.C § 920 (2012) involving the same victim, and one specification of rape in violation of Article 120(a)(1), 10 U.S.C. § 920 (2007) involving another alleged victim.

[3] This assignment of error was raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[4] PFC KS is a member of the U.S. Army National Guard.

[5] Record at 325.

the appellant. During the drive back to the apartment, PFC KS had removed her high-heeled shoes because they were hurting her feet. Upon arriving at the apartment, the appellant, "trying to be a gentleman[,]"[6] carried the barefooted PFC KS on his back across the paved parking lot to PS2 AS's apartment building.[7] While the appellant remained outside of the building, PFC KS went into the apartment and changed into more comfortable athletic shoes. When the group left the apartment to resume their celebration, the appellant left his car in the apartment parking lot and rode with DW to the first club.

Over the next several hours, the group drank, danced, and celebrated at multiple Norfolk area clubs.[8] At the first club, the appellant and PFC KS engaged in small talk and briefly danced. At the last club, after the appellant pulled her down onto his lap while he was seated, PFC KS began to dance to a song in a manner she and other witnesses described as "grinding"[9] but "it wasn't a stripper type lap dance neither [sic][.]"[10] After dancing in the chair for "barely the first verse," PFC KS went to the dance floor with PS2 AS and another female friend and continued to dance.[11] DW and the appellant joined them for the final song of the evening. At times during this final song, PFC KS and the appellant again danced in a "grinding" manner.[12] These two brief instances of "grinding" were the only sexually suggestive contacts between the appellant and PFC KS.

Shortly after the last song, all four left the club to go to a restaurant for breakfast. As they were leaving, PS2 AS discovered she had lost her apartment keys. Now unable to get back into PS2 AS's apartment, PFC KS and PS2 AS decided they would spend the night at DW's home after taking the appellant back to his vehicle.

After eating, the group left the restaurant to return the appellant to his vehicle. However, while on their way back to the apartment, the appellant told

---

[6] *Id.* at 298.

[7] *Id.* at 438.

[8] PFC KS described her level of intoxication after the night of drinking as "a bit tipsy." *Id.* at 532.

[9] *Id.* at 353, 445. Although "grinding" was not described with any specificity by PFC KS or any other witness, based upon the context of the record, we interpret "grinding" to mean closely dancing, or engaging in a form of popular close partner dancing during which one rubs their buttocks against the crotch area of their dance partner.

[10] *Id.* at 354.

[11] *Id.* at 445-46.

[12] *Id.* at 447.

the group that he too had lost his keys and asked to be taken back to his home. When the group arrived at the appellant's home, he suggested that they all just stay there for the night—which they did. The appellant showed them to the rooms they would be sleeping in—with PS2 AS and DW in one bedroom and PFC KS in the bedroom next to it. The appellant indicated he would sleep in the room across the hall.

Once settled into their room, PS2 AS sent DW to check on PFC KS. DW observed that PFC KS was alone in the room, getting into bed, and confirmed with her that she was all right. DW informed PS2 AS that PFC KS was fine and that he had closed the door to her room. PS2 AS and DW then went to sleep.

PFC KS testified that when she got to her room she was feeling "very tired" and "flopped" down on the bed to go to sleep—still wearing her dress and athletic shoes.[13] PFC KS testified that she remembered falling asleep on her stomach with her arms under her pillow and then being awakened by the door being pushed open. She then testified that within seconds she felt a man's genitals pressing against her thighs and his weight pushing her into the bed. She was able to turn her head far enough to see that it was the appellant who was holding her down as he began removing her underwear. PFC KS told the appellant "no"[14] and asked him to "stop."[15] She testified that the appellant responded, "[n]o, he didn't want to [stop]"[16] and then inserted his penis into her vagina. PFC KS explained that when she attempted to call out for PS2 AS, "trying to get help for her to come in there[,]"[17] the appellant wrapped his hand around her mouth so tightly that she "couldn't breathe."[18] PFC KS also recounted that the appellant was "pinning [her] down on the back of [her] neck" with his hand.[19] She further described how as the appellant was inside of her and holding her down, she tried unsuccessfully to get away from him.[20] PFC KS stated that the assault only ended when the appellant "had finished" and described how she felt his ejaculate "between [her] legs" and "right above [her]

---

[13] *Id.* at 457.

[14] *Id.* at 531.

[15] *Id.* at 526, 531.

[16] *Id.* at 527.

[17] *Id.* at 467.

[18] *Id.* at 469.

[19] *Id.*

[20] PFC KS testified that she was five feet tall and weighed 125 pounds at the time of the offense. *Id.* at 431.

butt."[21] After the appellant had finished, PFC KS testified that he released her, and she immediately went to PS2 AS and DW's room. As she was walking out of the room, the appellant told her "to not say anything to [PS2 AS]."[22] Upset and crying, PFC KS told PS2 AS that the appellant had "forced" himself on her.[23] PS2 AS asked PFC KS if the appellant had "penetrated her" to which she responded "yes."[24] PS2 AS, PFC KS, and DW immediately left the appellant's home. Once they were outside the home, PS2 AS asked PFC KS if she wanted to "go to the hospital" to which she replied "yes."[25]

At the hospital, PFC KS was then seen by Nurse TS, who examined and treated PFC KS. During the examination, PFC KS provided an account of the evening and the sexual assault. The Naval Criminal Investigative Service (NCIS) was notified of the assault, and initiated an investigation. During the investigation, PFC KS also provided NCIS a video-recorded account of the evening and the sexual assault.

## II. DISCUSSION

### A. Abatement

The first AOE we address is whether the military judge abused her discretion by refusing to abate the proceedings until PFC KS consented to an interview with defense counsel. The appellant argues that because the trial counsel had an opportunity to interview PFC KS pretrial and his defense team did not, PFC KS's refusal violated Article 46(a)'s guarantee of equal access to witnesses. We disagree.

We review a military judge's failure to abate a proceeding for an abuse of discretion. *United States v. Simmermacher*, 74 M.J. 196, 199 (C.A.A.F. 2015) (citing *United States v. Ivey*, 55 M.J. 251, 256 (C.A.A.F. 2001)). An abuse of discretion occurs when the military judge's findings of facts are clearly erroneous or the decision is influenced by an erroneous view of the law. *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013). "[W]hen judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993) (citation and internal quotation marks omitted).

---

[21] *Id*. 471.

[22] *Id*. at 535.

[23] *Id*. at 309.

[24] *Id*. at 310, 474.

[25] *Id*. at 475.

We begin our review by examining whether the military judge's findings of fact were clearly erroneous. In announcing her ruling, the military judge made several pertinent findings of fact: government counsel had not impeded or restricted the appellant's access to PFC KS; government counsel had only two substantive conversations with PFC KS in preparation for the trial; PFC KS was initially willing to answer interrogatories and participate in a limited interview with the defense; the case had been before the court for approximately a year; and the appellant had multiple avenues for obtaining information and developing areas upon which to question PFC KS—to include her video-recorded NCIS interview, all other discovery provided to the defense, and the opportunity and ability to interview the numerous other witnesses who were with PFC KS and the appellant throughout the night in question.[26] We find support for these findings in the record, do not find them to be clearly erroneous, and we adopt them.

We next look to see whether the military judge's refusal to abate the proceedings resulted from an erroneous view of the law. We find that it did not.

Article 46(a), UCMJ, provides that "[t]he counsel for the government, the counsel for the accused, and the court-martial shall have equal opportunity to obtain witness and other evidence in accordance with such regulations as the President may prescribe." RULE FOR COURTS-MARTIAL (R.C.M.) 701, MANUAL FOR COURTS-MARTIAL (MCM), UNITED STATES (2016 ed.) implements Article 46, UCMJ. R.C.M. 701(e) provides that "[e]ach party shall have . . . equal opportunity to interview witnesses[,]" and "[n]o party may unreasonably impede the access of another party to a witness or evidence." Furthermore, before trial, a witness cannot be compelled to speak to a trial defense counsel, and "may refuse to answer the questions of a defense counsel, so long as the [g]overnment has not induced that refusal." *United States v. Killebrew*, 9 M.J. 154, 160 (C.M.A. 1980) (citations omitted). Harkening back to their decision in *Killebrew*, our superior court has also affirmatively stated that a witness has no obligation to submit to a pretrial interview. *United States v. Morris*, 24 M.J. 93, 95 (C.M.A. 1987).

Here, the military judge found, and we agree, that the government counsel did not impede or restrict in any manner the appellant's access to PFC KS. PFC KS was independently represented and advised by a victim's legal counsel (VLC). There is no evidence that government counsel played any role in advising PFC KS whether to consent to an interview, nor is there evidence that the government played any role in PFC KS's ultimate decision not to participate in any pretrial interview with the appellant's trial defense counsel. As confirmed by the military judge through her *voir dire* of PFC KS, it was

---

[26] *Id.* at 501-03.

PFC KS—after consulting with her VLC and obtaining an understanding of the "parameters or rules or conditions" of any such interview—who decided not to submit to an interview by the appellant's defense team.[27]

Despite not finding an Article 46(a), UCMJ, violation, the military judge did authorize the trial defense counsel to cross-examine PFC KS concerning her refusal to consent to an interview.[28] The defense did not pursue this line of questioning.

Even assuming, *arguendo*, that a violation of Article 46, UCMJ, occurred, the appellant must demonstrate material prejudice. *See United States v. Adens,* 56 M.J. at 732 (holding that "violations of a [service member's] Article 46, UCMJ, rights that do not amount to constitutional error . . . must still be tested under the material prejudice standard of Article 59(a), UCMJ."). Article 59(a), UCMJ, states that "[a] finding or sentence of a court-martial may not be held incorrect on the ground of an error of law unless the error materially prejudices the substantial rights of the accused." Without specifying the "substantial prejudice" to him, the appellant generally argues that by not being able to interview PFC KS before trial he was unable to adequately prepare for the cross-examination. He claims to have only had "vague notions" of how PFC KS would respond to the questioning, and this limited his defense team's ability to "aggressively" question PFC KS.[29]

On appeal, the appellant fails to identify any areas of examination he would have pursued at trial but could not due to the military judge's ruling. We find that he has failed to demonstrate prejudice. Accordingly, we find this AOE without merit.

## B. Statements for the purposes of diagnosis and treatment

The appellant alleges that the military judge abused her discretion by admitting hearsay statements PFC KS made to Nurse TS under the medical diagnosis or treatment exception of MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 803(4), MCM. We disagree.

As a general rule, hearsay is not admissible unless its admission is determined by "a federal statute applicable in trial by court-martial," or an exception is provided by the Rules of Evidence. MIL. R. EVID. 802. MIL. R. EVID. 803(4) provides such an exception for statements that are "made for–and [are] reasonably pertinent to–medical diagnosis or treatment and [describe] medical

---

[27] *Id.* at 495-96.

[28] *Id.* at 502.

[29] Appellant's Brief of 31 Jul 2017 at 26-27.

history[,] past or present symptoms or sensations[,] their inception[,] or their general cause."

In *United States v. Edens*, 31 M.J. 267, 269 (C.M.A. 1990), our superior court established a two-part test for evaluating hearsay statements offered for admission under MIL. R. EVID. 803(4). "[F]irst, the statements must be made for the purposes of 'medical diagnosis or treatment'; and second, the [declarant] must make the statement 'with some expectation of receiving medical benefit for the medical diagnosis or treatment that is being sought." *Id.* (quoting *United States v. Deland*, 22 M.J. 70, 75 (C.M.A. 1986)).[30] "Thus, '[i]t is incumbent upon the moving party to show not only that the medical person was treating or diagnosing the patient, but also that the patient furnishing the information was seeking such help.'" *Id.* (quoting *United States v. Williamson*, 26 M.J. 115, 118 (C.M.A. 1988)). The key factor in determining if the second prong of the *Edens* test is met is "the state of mind or motive of the patient in giving the information . . . and the expectation of the patient that if he or she gives truthful information, it will help him or her be healed." *United States v. Clark*, 35 M.J. 98, 105 (C.M.A. 1992) (citation and internal quotation marks omitted). Even though sexual assault medical forensic examinations may serve dual purposes—medical diagnosis or treatment and evidence collection—the "critical question is whether [the patient] had some expectation of treatment when [the patient] talked to the caregivers." *United States v. Haner*, 49 M.J. 72, 76 (C.A.A.F. 1998).

In this case, the military judge did not explicitly place her findings of fact on the record when announcing her ruling to admit the hearsay statements. We find the following supported by the record and implicit in the military judge's ruling to admit the statements under MIL. R. EVID. 803(4).

Nurse TS was a board certified nurse practitioner and clinical nurse practitioner.[31] As such, Nurse TS was a person to whom PFC KS could make statements for the purpose of medical diagnosis or treatment as contemplated by MIL. R. EVID. 803(4). *See Haner*, 49 M.J. at 77 ("MIL. R. EVID. 803(4) is not limited to statements made to medically licensed doctors, but may include others, such as persons providing medical treatment under the supervision or direction of medical personnel."); *see also United States v. Cucuzzella*, 66 M.J. 57, 62 (C.A.A.F. 2008) (statements made to a nurse were properly admitted

---

[30] "The rationale for [MIL. R. EVID.] 803(4) is the self-interested motivation to speak the truth to a treating [medical provider] in order to receive proper care and the necessity of the statement for a diagnosis or treatment." *United States v. Quigley*, 35 M.J. 345, 347 (C.M.A. 1992) (citation omitted). "[A]n individual seeking relief from a medical problem has incentive to make accurate statements." MCM, App. 22, at A-22-63 (citation omitted).

[31] Record at 550-52.

under MIL. R. EVID. 803(4)). As an approximately 25-year-old adult at the time of the assault,[32] PFC KS would have known that a hospital is a place where she could receive medical care. She would have understood that at a hospital she would be evaluated for internal and external injuries resulting from sexual assault, tested for sexually transmitted diseases, and treated with preventative medications and contraceptives. PFC KS had ample reasons to seek medical attention—the appellant's use of force to quiet and subdue her, possible injuries from the forced intercourse, and the risk of exposure to sexually transmitted diseases and an unwanted pregnancy. Prior to conducting the sexual assault medical forensic examination, Nurse TS explained to PFC KS the purpose of the examination, what the examination would entail, how she would conduct the examination, and that PFC KS could consent to any, none, or all of the examination. Nurse TS testified that she provided this explanation so that PFC KS could make an informed decision as to whether or not to consent to the examination, prior to conducting the sexual assault medical forensic examination.[33] After receiving this explanation, PFC KS consented to the entirety of the examination and provided Nurse TS with her medical history,[34] described in detail the circumstances of the assault, her present symptoms and sensations, and their cause.[35] Based upon PFC KS's description of the assault and the symptoms and sensations she described, Nurse TS paid particular attention to the areas of potential injury—PFC KS's mouth, neck, abdomen, and genitals.[36] Nurse TS also tested PFC KS for possible sexually transmitted diseases[37] and provided PFC KS with post-sexual assault preventative medications.[38]

With this factual basis in mind, we review *de novo* the military judge's conclusion of law—that the statements were admissible under MIL. R. EVID. 803(4). We conclude that the statements at issue were made by PFC KS to Nurse TS for the purposes of "medical diagnosis or treatment," and that when PFC KS made the statements, she did so "with some expectation of receiving medical benefit for the medical diagnosis or treatment [she] sought" and

---

[32] *Id.* at 321. PS2 AS testified that at the time of trial (September 2016) PFC KS was 27 years old. The charged date of the offense was 22 November 2014.

[33] *Id.* at 553. Nurse TS testified that what was previously known as a "sexual forensic examination" was now known as a "sexual assault medical forensic examination" to more accurately describe the dual purpose of the examination.

[34] *Id.* at 559.

[35] *Id.* at 578-79.

[36] *Id.* at 578-84, 589-97.

[37] *Id.* at 571.

[38] *Id.* at 554, 571.

ultimately received. *Edens*, 31 M.J. at 269 (citation and internal quotation marks omitted). Accordingly, we find that the military judge did not abuse her discretion in admitting the statements.

## C. Factual sufficiency

The appellant challenges the factual sufficiency of his conviction.[39] We disagree, and find the conviction factually sufficient.

We review questions of factual sufficiency *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether "after weighing the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N.M. Ct. Crim. App. 2006) (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001).

The appellant stands convicted of sexually assaulting PFC KS in violation of Article 120(b)(1)(B), UCMJ. To sustain a conviction under this statue, we must be convinced beyond a reasonable doubt that: (1) the appellant committed a sexual act upon PFC KS, to wit: penetrated her vulva with his penis; and (2) the appellant did so by causing bodily harm to PFC KS by holding her down. MCM, Part IV, ¶ 45.b.(3)(b). Here, bodily harm means "any offensive touching of another, however slight[.]" *Id*. at ¶ 45.a.(g)(3).

---

[39] We note that the appellant does not challenge the legal sufficiency of the sexual assault conviction evidence upon which the military judge returned a finding of guilty for the sexual assault. However, we are mindful that Article 66(c), UCMJ requires us "to conduct a *de novo* review of [both the] legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990). "The test for legal sufficiency of the evidence is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Humphreys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation and internal quotation marks omitted). We find the evidence legally sufficient.

The government has met its burden on the first element. PFC KS's testified that the appellant committed a sexual act upon her—penetration of her vulva by his penis—and this testimony was corroborated by forensic evidence. The appellant's DNA was found on swabs taken from PFC KS's cervix and anus, and PFC KS's DNA was found on swabs taken from the appellant's penis. At trial the appellant did not contest that he had sexual intercourse with PFC KS, nor does he do so on appeal. Instead, the appellant argues that it is "impossible to ignore the probability of [PFC KS's] consent" given her flirtatious and sexualized behavior towards him that evening.[40] The appellant also argues that we should find PFC KS's account of their sexual encounter unreliable given her motive to fabricate.

The appellant avers on appeal that PFC KS "spent hours telegraphing her willingness to have sexual relations with [him]" by allowing him to carry her on his back and dancing with him "in a highly sexual manner,"[41] that the record contains no evidence that PFC KS struggled or resisted when the appellant committed the sexual act upon her, and that her motive to protect her marriage casts serious doubt on the credibility of her claims of sexual assault. This same theory was presented to and rejected by the members.

We, too, have considered PFC KS's flirtatious and sexually suggestive interactions with the appellant, as well as the possibility she may have fabricated her claim of sexual assault to protect her marriage. We do not find the claims sufficiently supported by the record to cause us reasonable doubt as to the appellant's guilt. Instead, we find PFC KS's testimony to be credible, consistent even through the crucible of cross-examination, and, in many significant aspects, corroborated or supported by other witnesses, the forensic evidence, and the surrounding circumstances.

The appellant had only met PFC KS hours before sexually assaulting her. Over the course of the evening, other than the very brief moments when PFC KS was being carried by the appellant on his back and "grinding" with him, no one observed any other form of intimate contact between them that evening. PFC KS went to bed alone, and fell asleep clothed in the same dress she had worn throughout the evening and still wearing athletic shoes. PFC KS was awakened by the appellant when he entered her room uninvited. When the appellant initiated his assault by holding her down, she communicated her lack of consent to the appellant by telling him "no"[42] and "stop."[43] Additionally, PFC KS's testimony that the appellant held her down and covered her mouth with

---

[40] Appellant's Brief at 19.

[41] *Id.*

[42] Record at 531.

[43] *Id.* at 526.

his hand as she attempted to call out for help, is supported, to some degree, by the presence of a male DNA profile on the swabs taken from her neck and the outside of her mouth. Finally, PFC KS's actions and demeanor following the incident belie appellant's claim that she fabricated the allegation of sexual assault to protect her marriage. Instead, they were consistent with someone who had just experienced a sexual assault rather than a secretive but regrettable consensual sexual tryst. She immediately fled the room, went directly to the safety of her sister-in-law, where she tearfully told PS2 AS that she had just been sexually assaulted by the appellant.

After weighing the evidence in the record of trial, and taking into account that we did not personally see or hear the witnesses, we too are firmly convinced of the appellant's guilt. *Rankin*, 63 M.J. at 557.

## D. Victim's unsworn statement at sentencing

The appellant complains that the military judge erred by allowing PFC KS to provide unsworn testimony in accordance with R.C.M. 1001A(b)(4) and, by doing so, violated the Article 42(b), UCMJ, requirement that all witnesses be sworn. We disagree.

The interpretation of R.C.M. 1001A is a question of law we review *de novo*. *United States v. Barker*, 77 M.J. 377, 382 (C.A.A.F. 2018). The question here is whether R.C.M. 1001A(b)(4) is in conflict with the UCMJ—specifically Article 42(b), UCMJ. We conclude that it is not.

The first principle in statutory construction is that "courts must give effect to the clear meaning of statutes as written and questions of statutory interpretation should begin and end . . . with [statutory] text, giving each word its ordinary, contemporary, and common meaning." *United States v. Andrews*, 77 M.J. 393 (C.A.A.F. 2018) (citations and internal quotation marks omitted) (alterations in original); *see also United States v. Schell*, 72 M.J. 339, 343 (C.A.A.F. 2013) ("Unless the text of a statute is ambiguous, the plain language of a statute will control unless it leads to an absurd result.") (citations and internal quotation marks omitted)). "We apply these principles [of statutory construction] when we interpret the rules and other provisions in the [MCM] as well." *Andrews*, 77 M.J. at 400 n.8.

When we examine provisions under the principles of statutory construction, we must also seek to construe independent provisions of a statute so that they harmonize rather than conflict. *United States v. Christian*, 63 M.J. 205, 208 (C.A.A.F. 2006). Articles 42 and 6b, UCMJ, are independent provisions of the same statute—the UCMJ. Likewise, when construing Presidential executive orders (such as R.C.M. 1001A) and a congressional enactment that covers the same subject, we should construe them, when

possible, to be in harmony rather than in conflict. *United States v. LeGrange*, 3 C.M.R. 76, 78 (C.M.A. 1952).

Article 42(b) provides that "[e]ach *witness* before a court-martial shall be examined on oath." (emphasis added). Stated alternatively, if the person providing information to the court-martial is not a witness there is no requirement that they be sworn.

By enacting Article 6b(a)(4)(B), UCMJ, Congress granted a victim the right to be "reasonably heard" at "[a] sentencing hearing" concerning the offense of which he or she is the victim.[44] Through the powers granted him in Article 36, UCMJ, the President implemented Article 6b, UCMJ, via R.C.M. 1001A. *Barker*, 77 M.J. at 383.

A victim is one "who has suffered direct physical, emotional, or pecuniary harm as a result of the commission of an offense of which the accused was found guilty." R.C.M. 1001A(b)(1). A victim's right to be reasonably heard at a sentencing proceeding "is independent of whether the victim testified during findings or is called to testify [as a witness] under R.C.M. 1001." R.C.M. 1001A(a). R.C.M. 1001A(b)(4)(B) allows a victim to exercise his or her right to be reasonably heard at a sentencing proceeding in non-capital cases by making an unsworn statement.

Procedurally, the R.C.M. 1001A(b)(4) right of a victim to make an unsworn statement is akin to an accused's R.C.M. 1001 right to make an unsworn statement. Like an accused, a victim may, personally or through counsel, make an unsworn statement orally, in writing, or both, and may not be cross-examined by counsel or examined by the court-martial upon it. R.C.M. 1001A(e); *cf.* R.C.M. 1001(c)(2)(C) (unsworn statement by an accused may be made personally or through counsel, and it may be made be made orally, in writing, or both, and may not be cross-examined or examined by the court upon it). Even though a victim may not be cross-examined or examined on their unsworn statement, such statements are not unfettered. Statements of fact contained within the unsworn statement may be rebutted by the trial counsel and defense counsel. R.C.M. 1001A(e). Additionally, the statement must comply with the requirements of R.C.M. 1001A. *See* R.C.M. 1001A(e)(2), Discussion ("A victim's unsworn statement should not exceed what is permitted under R.C.M. 1001A(c) . . . . Upon objection by either party or *sua sponte*, a military judge may stop or interrupt a victim's unsworn statement that includes matters outside the scope of R.C.M. 1001A(c)."). The scope of

---

[44] The National Defense Authorization Act for Fiscal Year 2014, Pub. L. No. 113-66, § 1701(b)(2)(A) (2013), incorporated The Crime Victims' Right Act (CVRA), 18 U.S.C. § 3771, into Article 6b, UCMJ, effective 26 December 2013. The CVRA includes the right of crime victims to be "reasonably heard" at sentencing.

matters to be addressed by a victim in his or her unsworn statement is limited to victim impact and matters in mitigation. R.C.M. 1001A(c). Victim impact is the "financial, social, psychological, or medical impact on the victim directly relating to or arising from the offense of which the accused has been found guilty." R.C.M. 1001A(b)(2).

Although Article 42(b), UCMJ, requires a witness to be sworn prior to giving testimony at a court-martial, a victim exercising their right to be reasonably heard at a sentencing proceeding under Article 6b, UCMJ, through the procedure established by R.C.M. 1001A, "is not considered a witness for the purposes of Article 42(b)[, UCMJ]." R.C.M. 1001A(a). Furthermore, our superior court has explicitly stated that an unsworn statement made by a victim during a sentencing proceeding "does not constitute witness testimony." *Barker*, 77 M.J. at 382; *cf. United States v. Satterley*, 52 M.J. 782, 785 (A.F. Ct. Crim. App. 1999), *aff'd on other grounds*, 55 M.J. 168 (C.A.A.F. 2001) (an unsworn statement given by the accused "is not a witness testifying under oath.").

Prior to the enactment of Article 6b, UCMJ, and the promulgation of R.C.M. 1001A, a victim's right to be heard at sentencing was grounded in R.C.M. 1001(b)(4), MCM (2012 ed.). Prior to the enactment of Article 6b, UCMJ, and the promulgation of R.C.M. 1001A, absent an agreement with the defense, a victim was required to take the stand as a witness and testify about the impact of an offense under oath, subject to cross-examination by opposing counsel and examination by the court. R.C.M. 1001(b)(4), MCM (2012 ed.). This procedure stood in stark contrast to that of United States district courts. The rights afforded a victim by Congress in Article 6b, UCMJ, and the ability of a victim to make an unsworn statement at a sentencing proceeding under R.C.M. 1001A(b)(4) brought sentencing proceedings in the military justice system more in line with the United States district courts. *See* FED. R. CRIM. P. 32(i)(4)(B) (requiring a United States district court to "address any victim of the crime who is present at sentencing and . . . permit the victim to be reasonably heard.") In the federal district court context, a victim is "reasonably heard" when presenting the court with an unsworn statement. [45]

---

[45] Federal courts have interpreted the right of a victim to be "reasonably heard" at a sentencing proceeding to include the right to provide an unsworn statement to the court. Other jurisdictions have also addressed this issue. *See United States v. Grigg*, 434 F.App'x 530, 533 (6th Cir. 2011) (unpublished op.) (citing *United States v. Myers*, 402 F. App'x 844, 845 (4th Cir. 2010)); *United States v. Swenson*, No. 1:13-cr-00091-BLW, 2014 U.S. Dist. LEXIS 115402, at *3-4 (D. Idaho Aug. 18, 2014); *United States v. Shrader*, No. 1:09-0270, 2010 U.S. Dist. LEXIS 121766, at *7-8 (S.D. W. Va. Nov. 16, 2010); *United States v. Marcello*, 370 F. Supp. 2d 745, 750 (N.D. Ill. 2005)).

The oath requirement of Article 42(b), UCMJ, does not apply to a victim providing an unsworn statement at a sentencing proceeding because such a victim—like an accused who provides an unsworn statement in sentencing—is not a witness for the purposes of Article 42(b), UCMJ. Accordingly, we find the appellant's argument without merit.

**E. Constitutionality of non-unanimous five-member panel findings**

The appellant argues that his court-martial findings, made by a non-unanimous panel of five members, fails to satisfy the constitutional requirements of due process. Challenges to the constitutionality of the findings of other similarly composed courts-martial have been repeatedly rejected. Because the death penalty was not mandatory for any of the appellant's charged offenses, a two-thirds vote by his five-member panel, and not unanimity, was the minimum required to convict him of any charged offense. Art. 52(a)(2), UCMJ; R.C.M. 921(c)(2)(B). *See United States v. Brown,* 65 M.J. 356, 359 (C.A.A.F. 2007) ("[M]ilitary criminal practice requires neither unanimous panel members, nor panel agreement on one theory of liability, as long as two-thirds of the panel members agree that the government has proven all elements of the offense."); *United States v. Viola,* 27 M.J. 456 (C.M.A. 1988) (summary disposition); *United States v. Wilt*, No. 201300274, 2015 CCA LEXIS 57 at *24-25, unpublished op. (N-M. Ct. Crim. App. 19 Feb 2015). Having reviewed this AOE, we find it without merit.[46]

### III. CONCLUSION

The findings and sentence are affirmed.

Senior Judge MARKS and Senior Judge JONES concur.

For the Court



R.H. TROIDL
Clerk of Court

---

[46] *See United States v. Clifton*, 35 M.J. 79, 81 (C.M.A. 1992).